714 P.2d 1303

**Michael C. MOORE and Royanna Moore, husband and wife; and Moore and Bale Partnership, Plaintiffs/Appellants,**

v.

**TITLE INSURANCE COMPANY OF MINNESOTA, a corporation, Defendant/Appellee.**

**No. 2 CA–CIV 5396.**

Court of Appeals of Arizona, Division 2, Department A.

Oct. 31, 1985.

Review Denied March 4, 1986.

Donald E. Gabriel, Tucson, for plaintiffs/appellants.

Waterfall, Economidis, Hanshaw & Villamana, P.C. by Steven M. Cox, Tucson, for defendant/appellee.

OPINION

HOWARD, Judge.

Plaintiffs filed this action against the defendant title company alleging that the defendant was negligent in failing to discover certain liens against property plaintiffs were purchasing and further alleging that this misconduct resulted in a breach of contract. The trial court, sitting without a jury, made findings of fact which included the following:

"1. Plaintiffs did not rely on the title search, analysis or opinion of Defendant Title Insurance Company of Minnesota in closing the purchase of the property in question, and plaintiffs' alleged damages

were not caused by said search, analysis or opinion.

\* \* \* \* \* \*

3. Plaintiffs' damages were caused by their own acts or omissions...."

Plaintiffs contend that the trial court's findings of facts were clearly erroneous and that liability for tort should be imposed against the title company.

The facts considered in the light most favorable to defendant are as follows. On July 10, 1979, Michael C. Moore, acting on behalf of the partnership of Moore and Bale, attended a meeting at the offices of Title Insurance Company of Minnesota (Minnesota) in Tucson. The meeting concerned the purchase by the partnership of certain apartments located in Sierra Vista, Arizona, owned by Mr. Nieman. Present at the meeting were Nieman, his real estate broker, Moore, Bale and Roy Rogers, an escrow officer of Minnesota. The purpose of the meeting was to work out the details of a deposit receipt and agreement in connection with the partnership's proposed purchase of the apartments.

The partnership was concerned about purchasing the property because Sierra Solar Systems, Inc., a corporation owned by Nieman, was in bankruptcy and there were serious delinquencies on the first deed of trust on the apartments held by Security Savings and Loan. Unless immediate cash was provided to Security Savings it was going to foreclose. Moore informed everyone at the meeting that the partnership did not want to enter into the transaction at all if there was any danger that Nieman personally would file bankruptcy or if there was any problem concerning the property that would bring it into the bankruptcy court.

A deposit receipt and agreement was typed at the Minnesota office. It provided for a purchase price of approximately $100,000. It disclosed the existence of three liens on the property: first lien to Security Savings in the approximate sum of $30,000, a second lien to S & D Cattle Company in the approximate sum of $30,-000 to $40,000 and a third lien to First National Bank in the approximate sum of $30,000. The agreement also contained the following terms and conditions:

"(1) If the subject property is subject to any liens other than the three liens described on page one, buyer shall have the option to terminate this agreement and all deposits shall be returned to buyer and buyer shall not be liable to seller for any amount nor may seller enforce this agreement."

Because of the threat of foreclosure on the first lien, the parties provided in the agreement for an earnest money deposit of $5,000 and a downpayment of $3,000. The partnership also was given the right to take possession of the property prior to closing, which was to occur in December of 1979. Under the agreement the partnership was given a $6,000 note and deed of trust on Nieman's house to secure repayment of the $5,000 earnest money, which the parties agreed the escrow could immediately disperse to Security Savings in order to cure the default and prevent a foreclosure. In the event the partnership did not close the transaction, the agreement provided that the partnership would be reimbursed for any expenditures on the property not covered by rents received by the partnership. The agreement further gave the partnership the right to cancel the agreement if it could not, after 21 days, obtain financing satisfactory to them in the form of a single loan in an amount sufficient to cover the existing liens.

Prior to signing the deposit receipt and agreement, Rogers told Moore that Minnesota had made a title search and there were no problems. Indeed, the record discloses that a preliminary title report was made searching the title up to July 10, 1979. It discloses no liens other than the realty mortgage owed to Security Savings, and the deeds of trust securing loans owed to S & D Cattle Company and First National Bank of Arizona.

The partners signed the agreement and took possession of the apartments. Although there were 14 apartments in exist-

ence at the time, only one of them was in shape to be rented and it was the duty of Bale to see to it that the remaining units were brought into a rentable condition. During their discussions with Nieman prior to signing the deposit receipt and agreement, Nieman represented to the partnership that the amount of money due and owing on the mortgage to S & D Cattle Company was closer to $30,000 with a discount and that the lienholder was cooperative. In fact, after taking possession, the partners discovered that the amount of the lien was claimed to be closer to $40,000 and that the S & D Cattle Company was not cooperative. It was also discovered that some of the fixtures and equipment in the apartments did not work and that there was cement in part of the sewer system. Bale commenced to repair the apartments and succeeded in getting six of them rented. Eventually the amount of rents came close to giving the partners a positive cash flow.

The partnership tried to get financing in order to pay off the second and third liens and eventually got First National Bank of Arizona to agree to lend them $60,000. Since this was approximately $10,000 less than the amount of the second and third liens, the sum was insufficient. As long as S & D Cattle Company claimed that it was owed $40,000, more money was needed. The partnership did, prior to the closing, institute a lawsuit against S & D Cattle Company to attempt to clear up the amount which was due and owing to it.

On December 13, 1979, the partners closed the deal in anticipation of persuading S & D Cattle Company to accept a lesser amount. At the time of the closing they did not have any financing.

Prior to the closing, Minnesota had prepared an amended preliminary title report which was given to the escrow officer. The only liens shown on this amended report were the liens that were previously known. Neither partner saw either of the preliminary title reports prior to closing the sale. The closing statement, which both partners saw, showed only the existence of the three liens previously mentioned and the closing statement showed that the partners were taking the property subject to these liens. Moore asked Rogers at the time about the three liens, and Rogers told him that he would let him know the balance due on each. Upon closing, the partnership released the $6,000 note which was given as security for the $45,000 earnest money and voided it. They also released Nieman's home in Sierra Vista, which was being held as security.

After the closing, Bale continued to work on improving the property. In April 1980, Bale moved to Kansas City. In November 1980, he made up a sales packet for the property showing a sale price of $155,000. He tried to sell the property to a prospect who, after checking into the deal, told Bale that the deal was not as represented since there were other outstanding liens on the property. About one month earlier, Moore was discussing financing with Lou Wallace of the First National Bank. Wallace told him that the bank would be happy to lend him money to pay off the first three liens, but asked Moore who was going to pay off the additional liens that his research showed existed on the property. This was the first time that Moore had any notice that there were additional liens.

Minnesota had failed to list the following liens of record on the property against Sierra Solar Systems, Inc.: Arizona Department of Economic Security, $329.36, recorded November 6, 1978; Arizona Department of Economic Security, $604.93, recorded November 29, 1978; United States Internal Revenue Service, $9,141.45, recorded January 15, 1979; Arizona Department of Economic Security, $214.82, recorded February 22, 1979, and United States Internal Revenue Service, $2,925.29, recorded March 13, 1979. Although a deed transferring the property from Sierra Solar Systems, Inc. to Nieman, individually, was executed and recorded on December 29, 1978, this deed was subsequently re-recorded by the title company on December 13, 1979 because of a defective acknowledgment.

Both personally and through his attorney, Moore communicated with Minnesota asking it to compensate the partnership for its failure to include all liens of record. The title company responded that it was responsible to protect and defend them with respect to the first two undisclosed liens on the subject property totalling about $1,000, but that it was not responsible for the other liens since they were filed after the debtor, Sierra Solar Systems, Inc., had transferred the property to Nieman in his individual capacity. This response did not satisfy the partnership. In the meantime, trustee's sales were noticed as to the deeds of trust held by S & D Cattle Company and First National Bank. Furthermore, the suit against S & D Cattle Company had not been resolved. Although the partnership had enough cash to pay off the liens that had not been disclosed by the title company, if they did so, they would not have the funds necessary to operate the apartments. First National Bank would not lend them the money unless they paid off the liens. The net result was that the partnership lost the property through the trustee's sales since it could not find permanent financing. This suit ensued.

At trial, both an expert witness on behalf of the plaintiffs and defendant's own employee, an escrow officer, testified that the title company had fallen below the standard of care of title companies under the circumstances by failing to discover and disclose all liens of record prior to closing.

It is plaintiffs' contention that the defendant was negligent in searching the title and that this negligence prevented them from exercising their option to terminate the contract. Plaintiffs contend that the title company should have the same liability as an abstractor of title. The title company contends that it is not an abstractor of title, that it is only an insurer and that it can only be liable for breach of contract. It argues that any duty on the part of an insurer to search the records has to be expressed and/or implied from the title policy issued to the plaintiff and that where, as here, the title company has no such duty under the title policy, any search that it may have actually undertaken was undertaken solely for its own protection against losses covered by its policy. See *Anderson v. Title Insurance Company*, 103 Idaho 875, 655 P.2d 82 (1982), and *Horn v. Lawyers Title Insurance Corporation*, 89 N.M. 709, 557 P.2d 206 (1976).[1] See also *Maggio v. Abstract Title & Mortgage Corporation*, 277 App.Div. 940, 98 N.Y.S.2d 1011 (1950).

We start with the proposition that an abstractor of title is negligent as a matter of law when it fails to include in its abstract liens which are of record. *Phoenix Title and Trust Company v. Continental Oil Company*, 43 Ariz. 219, 29 P.2d 1065 (1934), overruled on other grounds, *Donnelly Const. Co. v. Oberg/Hunt/Gilleland*, 139 Ariz. 184, 677 P.2d 1292 (1984). Other jurisdictions have held that a title insurance company has the liability of an abstractor of title when it inspects records and prepares title reports. *Garton v. Title Insurance and Trust Company*, 106 Cal. App.3d 365, 165 Cal.Rptr. 449 (1980); *Jarchow v. Transamerica Title Insurance Company*, 48 Cal.App.3d 917, 122 Cal.Rptr. 470 (1975); *Hawkins v. Oakland Title Insurance and Guaranty Company*, 165 Cal.App.2d 116, 331 P.2d 742 (1958); *Shada v. Title & Trust Company of Florida*, 457 So.2d 553 (Fla.App.1984); *Heyd v. Chicago Title Insurance Company*, 218 Neb. 296, 354 N.W.2d 154 (1984);[2] and see the dicta in *Laurence v. Kruckmeyer*, 124 Ariz. 488, 605 P.2d 466 (App.1979).

The rationale for imposing liability is best expressed in *Heyd v. Chicago Title Insurance Company*, supra:

"We now hold that a title insurance company which renders a title report and also issues a policy of title insurance has

---

1. The *Horn* case is distinguishable from the case sub judice because it does not appear in *Horn* that a title report was furnished to an escrow as is the case here.

2. See also *Shotwell v. Transamerica Title Insurance Company*, 91 Wash.2d 161, 588 P.2d 208 (1978). The Washington court has discussed the issue but has not yet decided it.

assumed two distinct duties. In rendering the title report the title insurance company serves as an abstractor of title and must list all matters of public record adversely affecting title to the real estate which is the subject of the title report. When a title insurance company fails to perform its duty to abstract title accurately, the title insurance company may be liable in tort for all damages proximately caused by such breach of duty. A title company's responsibility for its tortious conduct is distinct from the insurance company's responsibility existing on account of its policy of insurance. Different duties and responsibilities imposed on the title insurance company, therefore, can be the basis for separate causes of action—one cause of action in tort and another in contract." 354 N.W.2d at 158–159.

Support for the foregoing can also be found in § 552(1) of the Restatement (Second) of Torts, which states:

"One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

The preliminary title report was given to the escrow by the title insurance company. On the preliminary report, there is a section of "requirements." The requirements contained a list of documents that had to be drafted and executed by the escrow in order for the title insurance company to insure title. The title insurance company knew and intended that the escrow officer would use its preliminary title report both to comply with the requirements and to prepare a closing escrow statement for the parties. Clearly, the above section of the Restatement applies.

To hold otherwise would be to completely ignore reality. In addition, we note what one authority has said about this issue:

"Applicants for a title insurance policy are interested in obtaining the insurance coverage, but they are sometimes more interested in what the company examination of title discloses. This is perhaps partly at the base of the prevailing philosophy of title insurance companies—stressing the service of risk delineation rather than risk coverage." Johnstone, *Title Insurance*, 66 Yale L.J. 492, 494 (1957).

The insurance company holds itself out as a searcher of titles and provides the information for the applicants to act upon, and the applicants expect and rely on this information in closing their deals. We agree fully with the decision of the Nebraska court in *Heyd v. Chicago Title Insurance Company*, supra.

Having concluded that the title company can be held liable in tort for its negligence, we turn our attention to the issue upon which the trial court based its decision: reliance or, in other words, proximate cause. It is helpful to reiterate the plaintiffs' theory of liability. They claimed that the failure of the title company to disclose the liens of record prevented them from exercising their option to cancel the contract and that, had they known of the existence of the liens, they would have canceled.

Thus the case really hinged on their assertion that they would have canceled the contract. On one hand, the trial court had the testimony of the plaintiffs saying they would have canceled, pointing out that they had included special provisions in the agreement regarding the existence of any other undisclosed liens. On the other hand, there was evidence that Nieman had lied to them about the S & D Cattle Company loan, that the sewage system was damaged, that there were defective fixtures and appliances and that the partners were unable to obtain satisfactory financing prior to closing. In spite of these deficiencies, the plaintiffs chose to close the sale. They did not have to do so because of another

special provision which allowed them to cancel the contract if they did not have the necessary financing.

We believe that the evidence in this case was capable of two conclusions. The trial court could have believed that, in view of their decision to close the sale in the face of the adverse circumstances which were known to them, the partners would not have exercised the option of cancellation because of additional liens, but would have gone forward and closed the sale anyway in the hope of securing additional financing. Alternatively, it could have decided to believe the plaintiffs and found that the additional liens would have been the straw that broke the camel's back. It chose the former conclusion and not the latter.

An appellate court will not disturb the findings of fact of the trial court unless they are clearly erroneous. *Park Central Development Co. v. Roberts Dry Goods, Inc.*, 11 Ariz.App. 58, 461 P.2d 702 (1969). A finding of fact cannot be "clearly erroneous" if there is substantial evidence to support it, even though there might be substantial conflicting evidence. *Lewis v. Midway Lumber, Inc.*, 114 Ariz. 426, 561 P.2d 750 (App. 1977). Deciding what the plaintiffs would have done in this case, had they had knowledge of the liens, was peculiarly for the trial court to decide and there is substantial evidence to support its conclusion.

Affirmed.

BIRDSALL, P.J., and FERNANDEZ, J., concur.