806 P.2d 348

**ARIZONA BOARD OF REGENTS, a body corporate, and an agency of the State of Arizona; Rose Mofford, C. Diane Bishop, Andrew Hurwitz, Douglas Wall, A.J. Pfister, Donald E. Shrophire, Edith S. Auslander, Herman Chanen, Esther N. Capin, Donald Pitt and Patrick McWhorter, in their official capacities as members of the Arizona Board of Regents; and Molly C. Broad, in her official capacity as Executive Director and Chief Executive Officer of the Arizona Board of Regents, Plaintiffs / Counter–Defendants–Appellants/ Cross–Appellees,**

v.

**PHOENIX NEWSPAPERS, INC., dba the Arizona Republic; Cox Arizona Publications, Inc., dba Mesa Tribune, an Arizona corporation; Mary Jo Pitzl, an individual; and Eileen Myers, an individual, Defendants/Counter–Claimants–Appellees/Cross–Appellants.**

No. CV–90–0364–T/AP.

Supreme Court of Arizona, En Banc.

Jan. 10, 1991.

Reconsideration Denied March 5, 1991.*

---

* Corcoran, J., voted to grant reconsideration. Feldman, J., recused himself and did not participate in the determination of this matter. Fernandez, J., of the Court of Appeals, Division Two, sat in his place.

Lewis and Roca by John P. Frank, Janet A. Napolitano, Deborah Fine, Phoenix, John N. Iurino, Tucson, for plaintiffs/counter-defendants-appellants/cross-appellees.

Brown & Bain by Paul F. Eckstein, David J. Bodney and Daniel C. Barr, Phoenix, for defendants/counter-claimants-appellees/cross-appellants.

## OPINION

CAMERON, Justice.

### I. JURISDICTION

The Arizona Board of Regents (Board) appealed the superior court decision requiring the Board to make public the names and resumes of all persons in the prospect pool for appointment to the presidency of Arizona State University (ASU). Defendant Phoenix Newspapers, Inc. (Newspapers) filed a cross-appeal from the trial court's decision limiting the award of attor-

neys' fees to $35,000. The matter was transferred from the court of appeals to this court. *See* Rule 19(f), Ariz.R.Civil App.Prac., 17B A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3).

### II. QUESTIONS PRESENTED

1. Did the trial court err in holding that the Board must disclose the names and resumes of 256 prospective applicants, candidates, and nominees for appointment to the presidency of ASU?

2. Did the trial court err in holding that the names and resumes of the seventeen candidates must be disclosed?

3. Did the trial court err in awarding attorneys' fees to Phoenix Newspapers?

### III. FACTS

In October 1988, responding to then ASU President J. Russell Nelson's announcement of his intention to resign at the end of the 1988–89 academic year, Herman Chanen, then president of the Board, announced the formation of an ASU Presidential Search Committee (Committee). This Committee included various constituencies of ASU, three members of the Board, and Molly Broad, the Board's Executive Director. The Committee hired the executive search firm of Heidrick and Struggles, Inc. (HSI) to assist in identifying and evaluating candidates.

The Board and HSI concluded that confidentiality was critical in attracting and recruiting the most highly qualified prospects for the ASU presidency. William J. Bowen, Vice President of HSI, advised the Board that publishing the names of prospects in a university presidential search reduces the number of applicants by one-fourth, in effect skimming the cream off the pool of prospects. The Board's practice in previous presidential searches had been to keep the names confidential. In one of those searches, two of six finalists withdrew their names from consideration after their names were leaked to the press and published. Bowen strongly urged, and the Committee pledged to preserve, confidentiality.

HSI and the Committee carefully considered approximately 250 persons during the search process. Of those, fifty-nine people actually applied for the position. The others were nominated or suggested by other persons. Many of those nominated or suggested were unaware they were being considered, nor had they consented to being considered. None of the fifty-nine persons who actually applied made the final seventeen.

Bowen did not promise confidentiality in the letters HSI sent to the final seventeen candidates. Although fifteen of the seventeen candidates received oral assurances of the Board's best efforts to preserve confidentiality during the search process, neither the Board nor the Committee ever gave written assurance of confidentiality to any of the presidential candidates.

During the search process, the press and public learned the identity of the candidates, directly and indirectly. Committee members revealed some candidates' names and the remainder were discovered through other sources. Committee members interviewed each of the seventeen candidates in Arizona, his or her home state, or neutral locations.

In a letter dated 11 November 1988, Mary Jo Pitzl of the Arizona Republic asked to inspect the resumes of the people being considered for the ASU presidency. Later that month, Eileen Myers of the Mesa Tribune made a similar request. Both requested access to the information pursuant to A.R.S. §§ 39–121 to –121.03, Arizona's public records law.

After an initial meeting with representatives of the Newspapers and the Board in January 1989, the Newspapers' counsel served a second public records request that narrowed the scope of the requested records to the resumes of the "top 20 to 30" candidates and the finalists. In making this request, the Newspapers apparently did not forfeit their request for all the names.

On 28 February 1989, representatives of the Board and the Newspapers again met to discuss the pending public records request. At that meeting, the Board agreed to release the names of any finalists, as well as demographic information, excluding names, about the prospect pool as the search progressed. By late February or early March 1989, all candidate resumes were available to the Board for inspection at its office, but the Board refused access to the Newspapers. The Board agreed, however, to give the Newspapers meaningful access to the finalists' resumes. The extent of the agreement was disputed at trial.

On 24 April 1989, the Committee agreed to recommend three persons for the Board's consideration. Dr. Lattie Coor, Dr. Gordon Gee, and Dr. Charles Kiesler were contacted and agreed to go public as the finalists. Dr. Gee withdrew in early May and Dr. Kiesler withdrew just before the 25 May 1989 Board meeting. After declining an opportunity to reopen the final list, the Committee presented the list of the three finalists at the Board's 25 May 1989 public meeting.

On the same day, the Newspapers made another public records request, this time seeking the names and resumes of the seventeen persons who had been interviewed. The Newspapers included with their request a statement of intent to file a special action if the resumes were not produced the next afternoon.

After further negotiation, the Board, on 30 May 1989, provided the Newspapers with the complete resumes of Drs. Coor, Gee, and Kiesler, and edited versions of the other fourteen resumes. Using these resumes, the Newspapers eventually identified all seventeen people interviewed. The Republic published their names and background information on 30 June 1989. As of the date of the briefs, the Board had not provided the resumes of all 256 [1] prospects or the complete resumes of the fourteen interviewees.

1. We note that throughout the record these numbers range from 236 to 256. We will assume the correct number is 256.

On 30 May 1989, the same day the Board produced the three complete and fourteen edited resumes to the Newspapers, the Board filed a complaint for declaratory judgment, seeking a determination that it had properly exercised its discretion under the public records law in releasing the edited resumes, or, in the alternative, that the Newspapers had agreed not to press for the names and resumes of persons not selected as finalists. The Newspapers answered and counterclaimed for special action relief pursuant to A.R.S. § 39–121.02, claiming the Board's refusal to disclose the resumes of presidential candidates violated the public records law. The Newspapers also sought the unedited resumes and asked for their costs and attorneys fees, as provided for in A.R.S. § 39–121.02(B).

During the trial, the Newspapers moved to amend their answer and counterclaim to seek production of the resumes of all 256 persons considered. The court granted the Newspapers' motion to amend their pleadings to allege that the Board had violated the public records law in withholding the entire group of 256 prospect resumes. On 21 June 1990, the court entered a formal judgment ordering that the 256 names and resumes, as well as the final seventeen names, be disclosed. The judgment awarded the Newspapers $35,000 for costs and attorneys fees.

The Board and the Newspapers timely appealed. As noted above, we ordered the matter transferred to this court because it is a matter of statewide importance concerning an important question of law.

### IV. SCOPE OF REVIEW

In reviewing findings of fact and conclusions of law, we must recognize a trial court's findings of fact unless they are clearly erroneous. Rule 52(a), Ariz.R. Civ.P., 16 A.R.S.; *Park Central Develop. Co. v. Roberts Dry Goods, Inc.*, 11 Ariz. App. 58, 461 P.2d 702 (1969). The "unless clearly erroneous doctrine," however, applies only to appellate review of findings of fact. The doctrine "does not apply to the trial court's conclusions of law nor does it apply to findings of fact that are induced by an erroneous view of the law nor to findings that combine both fact and law when there is an error as to law." *Id.* at 60, 461 P.2d at 704.

We are not here concerned, however, with the trial court's findings of fact. The trial judge's findings were not clearly erroneous. Our concern is the trial judge's conclusions of law based upon her findings of fact. We are not bound by the trial court's conclusions of law and are free to draw our own conclusions of law from the facts found by the trial court. *Gary Outdoor v. Sun Lodge*, 133 Ariz. 240, 650 P.2d 1222 (1982); *Lane v. Bisceglia*, 15 Ariz. App. 269, 488 P.2d 474 (1971). The findings of fact and conclusions of law are found in appendix A following this opinion.

### V. THE 256 PROSPECTS

Arizona's public records statute reads:

Public records and other matters in the office of any officer at all times during office hours shall be open to inspection by any person.

A.R.S. § 39–121. This statute was adopted in 1901 and is taken from the California provision, Chapter 610, Cal.Sess.L. 1874, § 27. Although this statute has been interpreted to favor disclosure, this policy is not absolute. As we have noted:

While access and disclosure is the strong policy of the law, the law also recognizes that an unlimited right of inspection might lead to substantial and irreparable private or public harm; thus, where the countervailing interests of confidentiality, privacy or the best interests of the state should be appropriately invoked to prevent inspection, we hold that the officer or custodian may refuse inspection. Such discretionary refusal is subject to judicial scrutiny.

*Carlson v. Pima County*, 141 Ariz. 487, 491, 687 P.2d 1242, 1246 (1984) (citation omitted). We believe that the Board had the discretion to balance the countervailing interests in this case. *Id.; see also Mathews v. Pyle*, 75 Ariz. 76, 251 P.2d 893 (1952). When the release of information

258

would have an important and harmful effect on the duties of the officials or agency in question, there is discretion not to release the requested documents. *Church of Scientology v. City of Phoenix*, 122 Ariz. 338, 594 P.2d 1034 (Ct.App.1979). The record indicates that, as to some well-qualified candidates, confidentiality was critical in their decision to be interviewed.

■ The trial judge held that the 256 prospects and their resumes should be revealed to the media. We disagree. The 256 individuals were not yet candidates, but prospects. A prospect is a person in the initial large group that the Committee and HSI considers. A candidate is one who is seriously being considered, and is interviewed, for the position. The prospect may not know that he or she has been nominated, may not wish to be, and may find it embarrassing and harmful to his or her career. A candidate, on the other hand, may actively seek the office. Finalists are those persons actually submitted to the Board for selection.

In some cases the publicity attendant to the search has proven detrimental to the search process, resulting in lesser qualified, but thicker skinned, persons applying. The public's interest in ensuring the state's ability to secure the most qualified candidates for the university president's position is more compelling than its interest in, or need to know, the names of all of the prospects. *See Core v. U.S. Postal Service*, 730 F.2d 946 (4th Cir.1984) (Federal Freedom of Information Act did not require disclosure of unsuccessful applicants). We believe the Board may balance the interest of ASU and the people of Arizona in selecting the best possible president, with the public's right to knowledge of the selection process and the names of persons seriously considered for the position.

Revealing the names of all prospects, those nominated without their permission, and even those nominated with the prospects' tacit permission, could chill the at-

traction of the best possible candidates for the position. The interests of ASU and the citizens of this state are best served by not discouraging the "cream" from applying. The "countervailing interests of confidentiality, privacy [and] the best interest of the state [were, therefore,] appropriately invoked to prevent inspection...." *Carlson*, 141 Ariz. at 491, 687 P.2d at 1246. We therefore reverse the trial court's decision requiring the disclosure of all 256 names.[2]

## VI. THE FINAL SEVENTEEN

■ Candidates are prospects who are seriously considered, and who are interviewed for the job. As is the case in many hiring efforts, be it university president, football coach, or chief executive officer of a large business, those interested will already know who is being considered for the job. This, and the fact that the final candidates have an express desire for the job, should militate against maintaining confidentiality. Candidates who actively seek a job run the risk of their desire becoming public knowledge. Because they are candidates, they must expect that the public will, and should, know they are being considered. The public's legitimate interest in knowing which candidates are being considered for the job therefore outweighs the "countervailing interests of confidentiality, privacy [and] the best interests of the state...." *Id.* Therefore, it was not error for the trial court to order the release of the final seventeen names.

## VII. ATTORNEYS FEES AND COSTS

■ The Newspapers asked for attorneys fees and costs pursuant to A.R.S. § 39–121.02(B), which provides in pertinent part:

B. If the court determines that a person was wrongfully denied access to or the right to copy a public record and if the court finds that the custodian of such public record acted in bad faith, or in an arbitrary or capricious manner, the superior court may award to the petitioner

2. We note that the 256 letters, nominations, requests, etc., are not public records as defined by the statute. They may, however, be "other matters" within the scope of the statute. *Matthews v. Pyle*, 75 Ariz. 76, 79, 251 P.2d 893, 896 (1952).

legal costs, including reasonable attorney fees, as determined by the court.

The Newspapers' counsel contends that the "arbitrary and capricious" refusal to disclose the entire list of 256 names, as well as the final seventeen names, is bad faith. We do not agree. The evidence shows that the Board could reasonably have concluded that the welfare of the university required that the list of names be held in confidence. "Where there is room for two opinions, the action is not arbitrary or capricious if exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached." *Tucson Public Schools, Dist. No. 1 v. Green*, 17 Ariz.App. 91, 94, 495 P.2d 861, 864 (1972).

The most that can be said here is that reasonable people might differ. We find no arbitrary or capricious conduct or bad faith on the Board's part. The Newspapers are not entitled to attorneys' fees.

## VIII. CONCLUSION

We reverse the trial court's holding that the Board must disclose the names and resumes of all 256 prospects; the trial court's award of attorneys fees is similarly reversed. We affirm the trial court's holding that the names of the seventeen candidates must be disclosed.

We note that it might be helpful to the court, the Board, and candidates, if the Board adopted rules of procedure for nominating university presidents. The adoption of rules could avoid a recurrence of future litigation. These rules could indicate when a prospect becomes a candidate and when confidentiality ends.

GORDON, C.J., MOELLER, J., and LLOYD FERNANDEZ, J., Court of Appeals, concur.

FELDMAN, V.C.J., did not sit on this matter. Pursuant to Ariz. Const. art. 6, § 3, LLOYD FERNANDEZ, Judge, Court of Appeals, Division Two, was assigned to sit in his stead.

CORCORAN, Justice, dissenting:

I respectfully dissent.

### I

The nature of government is to want to work in secret. The Arizona Legislature, however, has adopted the Public Records Law and the Open Meetings Law, which require that government records be available to the public and meetings be open to the public. The lesson taught is: *public business should be done in public.* In this case, we deal with the arcane, obscure, and byzantine conventions of courtship by which the president was selected for the 5th largest public university in the United States. The secret process of selection used by the Board of Regents in this case is at odds with the Public Records Law.

### II

The trial court made detailed findings of fact and conclusions of law pursuant to rule 52(a), Arizona Rules of Civil Procedure, in support of the judgment entered in favor of the Newspapers. *See* Appendix A. These findings "shall not be set aside unless clearly erroneous." Rule 52(a). The findings of fact by the trial court are not only not clearly erroneous, but are supported by substantial credible evidence, and should therefore be affirmed. *See Mitchell v. Superior Court*, 142 Ariz. 332, 335, 690 P.2d 51, 54 (1984); *Moorehead v. Arnold*, 130 Ariz. 503, 505, 637 P.2d 305, 307 (App. 1981). This would be true even when substantial conflicting evidence exists. *See Moore v. Title Ins. Co.*, 148 Ariz. 408, 413, 714 P.2d 1303, 1308 (App.1985). Here, the majority has not found the trial court's findings of fact to be clearly erroneous; we, therefore, are bound by them. The majority does not agree with the trial court's conclusions of law.

The following conclusions of law are dispositive of this case and should be adopted by this court:

7. There is no statutory exemption from the Public Records Law that is applicable to the resumes of the appli-

cants, nominees or finalists for the ASU presidency.

. . . .

12. The selection process in the future for presidents of any of the institutions of higher education in the State of Arizona would not be harmed but would be benefited from the publication of the names and identifying information of all persons considered by the Board of Regents; the public interest is served by proving that a university presidential search was not rigged nor discriminatory, was authentic, was an open and wide search and was designed to get the best possible person, would permit the public to comment on the qualities or on objections to any persons considered by bringing to the attention of the Board of Regents information regarding those persons which may not be known to the Board of Regents. The court has found that none of the persons on the total list [of 256] would suffer any harm from such disclosure, and therefore the court finds that the publication of the entire list will not reduce the number of qualified candidates which the Board of Regents could initially consider.

### III

Although line drawing is necessary in balancing the competing interests of open government and confidentiality that may assist the operation of government, I part from the majority because it concludes that both the Board[3] and this court have the authority to do the line drawing.

The Arizona Legislature should draw the lines. Ariz. Const. art. III. For instance, the legislature has amended the Open Meetings Law numerous times since 1962. *See* A.R.S. §§ 38–431 through –431.09; *cf. City of Prescott v. Town of Chino Valley,* 166 Ariz. 480, 803 P.2d 891 (1990) (legislature recognized 7 specific exceptions to policy in favor of public meetings, *see* A.R.S.

§ 38–431.03(A)). The legislature has drawn and redrawn lines; it has balanced the interests regarding government meetings.

More pointedly, the Arizona Legislature *has* exercised the same discretion in line drawing under the Public Records Law and, in a number of statutes, has adopted exemptions or exceptions. The operative section of the Public Records Law was adopted 90 years ago. A.R.S. § 39–121 tells us:

Public records and other matters in the office of any officer at all times during office hours shall be open to inspection by any person.

The legislature has dealt with "confidentiality" in a variety of ways. Some statutes provide that certain records are exempt records, or *are* public records with exceptions, or are *not* public records with or without exceptions. For instance:

the working papers and audit files of the Auditor General "are not public records and are exempt from" the Public Records Law, and may only be disclosed to the Attorney General or a County Attorney, A.R.S. § 41–1279.05(A);

the records and other matters of nonprofit corporations that are lessees of the Board of Regents are specifically subject to the Public Records Law, with certain exceptions, A.R.S. § 15–1638(A);

the records of the Banking Department relating to financial institutions "shall not be public documents nor shall they be open for inspection by the public," except that the Superintendent of Banks can disclose information to specific entities, A.R.S. § 6–129(A);

records and information possessed by the Department of Environmental Quality are specifically subject to the Public Records Law, with certain exceptions, A.R.S. § 49–928;

all records of "prisoner care and custody" are specifically subject to the Public

---

**3.** The Board drew lines in this case. It had an agreement with the Newspapers to release the names of "any finalists." The Board also agreed to give the Newspapers "meaningful access to the finalists' resumes." When the "list" of three "finalists" was made public on May 25, 1989, two of the three had already withdrawn from consideration, presenting the Newspapers and the public with a list of *one* finalist.

Records Law, with certain exceptions, A.R.S. § 31–221(C); and

architects' application transcripts, letters of inquiry, references, and investigation files of any pending investigation are "confidential and not public records," A.R.S. § 32–129.

Additionally, the Arizona Legislature has permitted, in some situations, what the majority suggests the Board of Regents has inherent authority to do—adopt rules regarding specific "confidential" information: the Department of Health Services must adopt "rules and regulations" to protect "confidential information" as required by state or federal law, A.R.S. § 36–107; the Arizona Health Care Cost Containment System Administration must "prescribe by rule the types of information that are confidential and circumstances under which such information may be used or released," A.R.S. § 36–2903(J); the Board of Psychologist Examiners must adopt "rules and regulations" regarding confidentiality of its records, A.R.S. § 32–2063(A)(7); the Department of Economic Security shall adopt regulations to protect confidential information, A.R.S. § 46–135; and

vital records may not be inspected except pursuant to regulations promulgated by the Department of Health Services, A.R.S. § 36–340(A).

I agree with the majority in *Board of Regents v. Atlanta Journal*, 259 Ga. 214, 217, 378 S.E.2d 305, 308 (1989):

[t]he public policy issue of what information or actions involved in the search for an official may be withheld from disclosure rests with the legislative branch.

The legislature may act and draw the appropriate lines regarding disclosure, or authorize the Board to adopt rules and regulations regarding confidentiality. Until the legislature acts, this court should apply the broad terms of the Public Records Law to the searches for presidents of the state universities.

## IV

The judgment should be affirmed and, because the trial court specifically found

that the Board acted in an arbitrary and capricious manner, the Newspapers should recover their requested attorneys' fees pursuant to A.R.S. § 39–121.02(B).

## APPENDIX A

The trial court made the following pertinent findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Phoenix Newspapers, Inc., is an Arizona corporation that publishes the *Arizona Republic*, a daily newspaper published in the State of Arizona. Mary Jo Pitzl is a reporter for the *Arizona Republic*.

2. Cox Arizona Publications, Inc., is a Delaware corporation that publishes the *Mesa Tribune*, the *Tempe Daily News Tribune* and the *Chandler Arizonan Tribune*, all daily newspapers in the State of Arizona. Eileen Myers was, at all relevant times in this action, a reporter for the *Tribune* newspapers.

3. Plaintiff Arizona Board of Regents ("the Board") is a corporate body charged by the Arizona Constitution and Statutes with the governance of the three universities in Arizona. Molly Broad is the Board's Executive Director and Chief Executive Officer.

4. The presidency of Arizona State University ("ASU") is a public office funded by the State of Arizona. ASU is the fifth largest publicly funded university in the United States.

5. In August 1988, ASU president J. Russell Nelson announced his intention to resign at the end of the 1988–89 academic year.

6. Thereafter, the Board commenced a search for a new ASU president. The Board consulted professional search firms and other experts in the field of university presidential searches to determine the best way to conduct the search. In November 1988 the Board retained a professional search consultant, Heidrick & Struggles, Inc., to assist in its search for candidates for the ASU presidency. William J. Bowen, Vice President of Heidrick & Struggles,

held the primary responsibility for his company's role in the ASU search. The Board concluded, as prior members of the Board in prior searches for university presidents had done, that confidentiality was critical to attracting and recruiting the most highly qualified prospects for the ASU presidency.

7. The Board also formed a 14 person Search Committee made up of a broad cross-section of the university community and the community at large to assist the search consultant in the search process. The Board's belief regarding the necessity of confidentiality was explained to the members of the Search Committee, each of whom pledged to preserve confidentiality.

9. Heidrick & Struggles, Inc., did not promise confidentiality in the letters it sent to nominees and prospective candidates for the ASU presidency; no written assurance of confidentiality was given to any of the final 17 presidential prospects; these prospects were given oral assurance that the Board would make its best efforts to preserve confidentiality until a mutual level of interest was reached between the prospect and search committee, but that when the prospect became a finalist, his or her name and resume would become public. Mr. Bowen testified that 15 out of the 17 wanted to be assured of confidentiality.

10. Heidrick & Struggles developed a list of 256 prospective candidates, of whom approximately 59 applied. The balance had been nominated or suggested by other persons. Many of those nominated for the ASU presidency were unaware that his or her name had been submitted for consideration and had not given consent to this action. All of the 59 persons who had applied originally were eliminated in the selection process and were not among the 17 prospects interviewed by the Search Committee.

11. The Search Committee narrowed the list of 236 to 17 who met the criteria formulated by the Board. Mr. Bowen contacted the 17 prospects in March of 1989 to arrange for members of the Search Committee to meet each one of them. A high percentage of the 17 had not expressed an interest in applying for the ASU presidency, but were interested in remaining in the search. They had not committed themselves nor fully declared they wanted to be a candidate but they were interested in continuation of the process of development and exploration of mutuality of interest. The remaining 17 persons indicated they would not go forward except for the promise of confidentiality.

12. All 17 final candidates were either flown to Arizona at public expense for interviews with members of the Search Committee or member of the Search Committee traveled at public expense to interview them in their homes states.

13. On November 11, 1988, defendants requested access to the resumes of all persons being considered by the ASU presidential Search Committee and/or the search consultant by February 10, 1989. This request was made pursuant to the Arizona Public Records Law.

14. Future searches for the presidency of institutions of higher education in the State of Arizona will not be harmed by the publication at this time of the resumes of those persons among the 14 named by Mary Jo Pitzl in her article on June 30, 1989, if those named in the article were in fact among those considered by the plaintiff's Search Committee. This conclusion is based specifically upon the testimony of the plaintiff's witnesses that those 14 had not applied for or submitted their names for consideration; that they had not declared that they wanted to be a candidate, but that they proceeded with the interviews by the search committee because they were interested in learning more about ASU and were exploring a possible mutuality of interest with the search committee.

15. On February 28, 1989, representatives of the Board and defendants, and their attorneys, met to discuss the pending January 11 records request. At that meeting, representatives of the Board agreed that defendants would be furnished a demographic breakdown of the entire pool of the prospects, and when they had a short list of candidates, defendants would receive the resumes and have the opportunity to

interview the prospects when they were brought to the campus. The defendants said that they would accept the information given them and not pursue legal action if given timely information. Defendants dispute that they were given timely information or that they were given the "short list" of the prospects.

Mr. Schwartz testified that he believed the defendants would receive a list of 5 to 7 candidates whom the defendants could interview and could write background articles about the accomplishments and strengths of the persons who were being considered by the Board, so that their readers could decide if the right choice was made. Mr. Schwartz further testified that although there was an agreement not to sue that day, the defendants did not agree not to ask for additional information on the candidates and not to sue sometime in the future. He testified that the plaintiff did not promise to furnish the defendants a complete list of the 236 prospects. There was a discussion, according to Mr. Schwartz, about how many would be on the "short list" and the Board's representatives could not tell the defendants.

Mary Jo Pitzl testified that when she left the February 28th meeting, she felt happy that she would get a meaningful list of the finalist candidates. Mary Jo Pitzl further testified that she had been told that it was highly unlikely that the short list would be only one name, but not impossible; further, that the prospect of litigation was not discussed. None of the defendants agreed not to pursue further information, however, the defendants did not ask for resumes in March, April, or until May 25th. As Ms. Pitzl testified, she agreed at the time with her counsel's published statement: "The deal we worked out satisfied the public's right to know."

The court cannot find that there was a settlement agreement regarding the defendants' public records request which was violated by the defendants. Both sides apparently believed that the resumes of the final candidates would be furnished to the defendants; and had there been a short list

of 5 to 7 names on it, both sides would have been content. However, the plaintiff's representatives believed all fires had been extinguished and that they could proceed with their selection process, paring the list down. Further oral commitments were made to the prospects that their names would remain confidential until they became final candidates, at which time their names would be released to the public if they wished to go forward as candidates after being given the choice to withdraw from consideration.

16. On April 24, 1989, following input from the members of the search committee, the search consultant concluded that three persons—Dr. Lattie Coor, Dr. Charles Kiesler and Dr. Gordon Gee—met the criteria of the search committee and that they should be recommended for consideration to the plaintiff, if those persons were willing to have their candidacies go forward publicly. Thereafter these three persons agreed to have their candidacies go forward publicly.

17. During the first week of May 1989, Dr. Gordon Gee withdrew his name from consideration for the ASU presidency.

18. On May 22, 1989, Dr. Charles Kiesler also withdrew his name from consideration, leaving only one candidate, Dr. Lattie Coor.

19. Thereafter, the members of the Search Committee were asked to reevaluate their recommendations to the Board, but chose not to recommend another final candidate either from the remaining 14 of the 17 originally interviewed by the Search Committee or from the original 236 names given to the Search Committee by Heidrich & Struggles.

20. On May 25, 1989, plaintiff released the names of three "finalists" to defendants and to the public. On the same date, defendants learned that two of three finalists previously had withdrawn from consideration and the list of finalists contained only one viable candidate, Dr. Lattie Coor; at the time of the announcement, the other two finalists had withdrawn their candidacies. Defendants then made another public records request seeking the resumes of all

17 persons who had been interviewed by the Search Committee.

21. On May 30, 1989, the Regents provided defendants with the resumes of Drs. Lattie Coor, Gee and Kiesler and with the substantially edited resumes of all 17 persons who had been interviewed by the Search Committee.

The board believed that it had complied with the directives of the Arizona Supreme Court in *Carlson v. Pima County,* 141 Ariz. 487, 687 P.2d 1242, which held that the practical alternative to the complete denial of public access to information sought from a public officer would be by deleting specific personal indentifying information such as names. Molly Broad testified that the purpose of the editing of the resumes was to demonstrate the deep commitment the Board had to get along with the press and to its continued willingness to exhibit good faith; to give the press as much information possible regarding the candidates which would not divulge the identify of the individual and yet demonstrate that qualified and experienced persons were being considered.

The Board then filed a Declaratory Judgment action against defendants to seek guidance from the court to balance the competing values of the public's right to know and the best interests of the State to attract the highest quality of applicants for the ASU presidency which the Board believed would be jeopardized by the publication of the names of those persons who agreed to be considered for selection. The decision to sue the papers was not made in a public meeting of a quorum of the Board, but instead was carried out pursuant to Board Policy 1–109.

22. On June 14, 1989, defendants filed a counterclaim against plaintiff. At the initiation of this action, defendants agreed to pay their attorneys $35,000.00 plus whatever amount the Court might award in attorneys' fees.

23. Although considerable material had been deleted from the resumes by plaintiff, Mary Jo Pitzl wrote an article on June 30, 1989 in the *Arizona Republic* in which she identified 14 persons as the remaining undisclosed 14 finalists relying on the edited resumes.

24. On June 29, 1989, Mary Jo Pitzl called one of the members of the Search Committee and that member confirmed to her the names of 12 of the 14 final candidates and one of the finalists, Eugene Tranni of the University of Wisconsin, confirmed that he was among the 17 prospects considered. However, when contacted, he told her: "The last thing I need is my name appearing in your newspaper;" she interpreted his comment that he did not want his name appearing.

25. Prior to the Board's selection of Dr. Coor, Jack Pfister, a member of both the Board and the Search Committee, acknowledged to a newspaper reporter from Minneapolis that Dean Robert Stein of the University of Minnesota College of Law, was one of the persons interviewed by the Search Committee.

26. Plaintiff's own witnesses testified that individual candidates would not be harmed if the Board released the names of all the nominees and applicants for the ASU presidency. Mr. Bowen testified that to print the entire list of the 239 names would be "innocuous." Thomas Bartlett, Chancellor the Oregon State University System, testified that there would be no harm if the Board published a list similar to the list of the 141 candidates released by the University of Texas at Austin ("very little harm" if the entire list were published at the outset of the presidential search). Dr. John Corbally, former President of the University of Illinois system, testified that the individual candidates would not be harmed if the Board released the full list of names.

27. The Board did not present the name of one person who has been or would be harmed by being identified publicly as a candidate in the ASU presidential search. Plaintiff sought to have an *in camera* hearing wherein 6 of the 14 persons interviewed by the Search Committee could testify by phone—under an order of confidentiality to prevent their identifies from being revealed on the record—presumably about

the harm that could result to those candidates whose identifies were disclosed or to Arizona's universities if the most well qualified person refused to participate in the selection process. The court declined to exclude defendants from any such hearing.

However, some of plaintiff's witnesses testified, without ever naming the person involved, of specific harm which befell others who were not selected but whose identity was revealed.

John Phillips, an employee of a search firm that is a rival of Heidrick & Struggles, testified about a nationally prominent president of a private college who allowed his name to be considered in a presidential search. When his Board of Trustees learned of this, he was chastised; the second time his name was revealed as a finalist, even though he attempted to withdraw from consideration, the chairman of his board told him to look for another job.

John Corbally, a former president of the University of Illinois system, testified he personally would not apply for a presidential position; that the prospect is sought out and recruited; that in the 1971 search for the presidency of Ohio University, five sitting presidents were finalists, but when it became necessary to publish their names, all 5 of them withdrew and there had to be a second search. He testified that the cream of the applicants would withdraw or refuse to be considered leaving the pool reduced; and without confidentiality there would be a smaller pool of candidates from which to select.

Tom Bartlett, Chancellor of the Oregon System of Higher Education, testified on a search in which he was involved in Oregon when he advised the 3 or 4 finalists that they would be subject to public interviews, only one agreed to have his name made public and the other prospects withdrew, leaving only one person (who was a good man). He further testified briefly about the harm to a midwestern president of a school who was put on probation when his institution learned that his name was being considered for another position.

Ira Michael Heyman, Chancellor of the University of California, Berkeley, submitted an affidavit which stated that in his opinion well-qualified candidates are not willing to be considered unless they can be assured of confidentiality from the outset, or only in the case they are finalists for the position for the reasons their interest in other positions undercuts the trust and confidence of their current boards to know of their interest at another university. His affidavit states of one provost search and one vice chancellor search in which candidates who were very well qualified withdrew because the information concerning their interest was made public.

28. Defendants, however, obtained admissions from plaintiff's witnesses of many identified persons who were considered publicly for other university presidencies on several occasions, and had suffered no harm to date, namely, Dean C. Roland Haden at Arizona State University College of Engineering who was a candidate for the presidency of Texas Tech University, one of five finalists for the chancellory of Louisiana State University, and possibly one of the 17 finalists for the ASU presidential search involved in this action.

Southern Illinois University Chancellor Lawrence K. Pettit, who was identified as among 162 candidates for the presidency of Texas Tech, and possibly one of the 17 considered for the presidency of ASU.

That two of those persons whose names had been revealed in Mary Jo Pitzl's article as being among the 14 undisclosed final prospects for the ASU presidency were selected for other university presidencies.

That to date there has been no evidence of harm to either of the two finalists who withdrew before the final selection for the ASU presidency, namely University of Colorado President Gordon Gee or Vanderbilt University Provost Charles Kiesler.

The finalist who was selected as the ASU president, Lattie Coor, had been publicly named as a candidate for three other university presidential searches and suffered no harm from his name being publicized in those searches without success.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over plaintiff's complaint pursuant to A.R.S. § 12–1831 *et seq.*, and over the defendants' counterclaim pursuant to Arizona Rules of Procedure for Special Actions and A.R.S. § 39–121.02.

2. Each member of the Board and its Search Committee is a "public officer" as defined by A.R.S. § 39–121.01(A)(1).

3. As the Board's Executive Director and Chief Executive Officer, Molly Broad, is a "public officer" as defined in A.R.S. § 39–121.01(A)(1).

4. Pursuant to A.R.S. § 39–121.01(B), the resumes of the applicants for the ASU presidency are "public records" because they are "records reasonably necessary or appropriate" for the plaintiff and its Chief Executive Officer, Mrs. Broad, "to maintain an accurate knowledge of their official activities." A.R.S. § 39–121.01(B).

5. Pursuant to A.R.S. § 39–121, "[p]ublic records and other matters in the office of a public officer at all times during office hours shall be open to inspection by any person." In light of the statutory policy favoring disclosure, there is a presumption that the records maintained by a public officer are open to the public for inspection. *Carlson v. Pima County*, 141 Ariz. 487, 687 P.2d 1242 (1984).

6. The Board must "appoint and employ" presidents for the three state universities, including Arizona State University. A.R.S. § 15–1626(A)(2).

7. There is no statutory exemption from the Public Records Law that is applicable to the resumes of the applicants, nominees or finalists for the ASU presidency.

8. A public officer or custodian of the public record may refuse inspection of the public record where the unlimited right of inspection might lead to substantial and irreparable private or public harm; thus were the countervailing interests of confidentiality, privacy or the best interests of the state in carrying out its legitimate activities outweigh the general policy of public access, the public officer may deny the inspection of the records. *Carlson*, 141 Ariz. 487, 687 P.2d 1242.

9. The refusal of the public officer to permit inspection of a public record is subject to judicial scrutiny.

10. The court cannot find that there was a settlement agreement regarding the defendants' public records request which was violated by the defendants. See Findings of Fact, paragraph 15.

11. The selection process for the presidency of institutions of higher education in the State of Arizona would not be harmed by the publication of the names and titles of the entire list of persons whose names were suggested for consideration by the Board of Regents at the time the list was completed. This conclusion is based specifically upon the testimony of plaintiff's witnesses that many of those persons had not applied for or submitted their names for consideration, but they were unaware that their names had been suggested by other persons, and therefore they truthfully could deny that they were considering any move from their present positions.

12. The selection process in the future for presidents of any of the institutions of higher education in the State of Arizona would not be harmed but would be benefited from the publication of the names and identifying information of all persons considered by the Board of Regents; the public interest is served by proving that a university presidential search was not rigged nor discretionary, was authentic, was an open and wide search and was designed to get the best possible person, would permit the public to comment on the qualities or on objections to any persons considered by bringing to the attention of the Board of Regents information regarding those persons which may not be known to the Board of Regents. The court has found that none of the persons on the total list would suffer any harm from such disclosure, and therefore the court finds that the publication of the entire list will not reduce the number of qualified candidates which the Board of Regents could initially consider.

13. In all probability, any harm that could befall any of the remaining 14 "finalists" by now being identified publicly has occurred already. In all probability, defendants have identified them in their newspapers from (a) the edited resumes furnished to the defendants by the plaintiff; (b) a Search Committee member who confirmed for the *Arizona Republic* the names of 12 of the 14 unidentified finalists; (c) Jack Pfister, a member of the Board, who confirmed the identity of one of the "finalists" for a Minneapolis newspaper; or (d) one of the candidates who admitted to Ms. Pitzl that he had been one of the 17 "finalists." The court assumes that publicity concerning those persons named by Ms. Pitzl reached the constituencies of those persons names; and further, that they have now commenced their academic duties in their present positions.

14. Future searches for the presidency of institutions of higher education in the State of Arizona will not be harmed by the publication at this time of the resumes of those persons among the 14 named by Mary Jo Pitzl in her article on June 30, 1989, if those named in the article were in fact among those considered by the plaintiff's Search Committee. This conclusion is based specifically upon the testimony of the plaintiff's witnesses that those 14 had not applied for or submitted their names for consideration; that they had not declared that they wanted to be a candidate, but that they proceeded with the interviews by the search committee because they were interested in learning more about ASU and were exploring a possible mutuality of interest with the search committee.

15. The court does not, cannot, and need not make a factual finding that the best interests of the State of Arizona in the future selection process of presidents of the state universities would or would not be harmed if the identities of those persons interviewed prior to the selection of the final candidates were disclosed. Unfortunately in this case, promises of an effort to keep their names confidential were made to those interviewed. The court has heard and considered the testimony of many highly respected persons on both sides of the issue. It is also unfortunate, in this instance, that there was public disclosure of only one viable person from the entire selection process.

16. Plaintiff did not act in an arbitrary and capricious manner by refusing to release the resumes of the 17 persons who had been interviewed by the Selection Committee prior to the choice of the three finalists whose names were disclosed. The plaintiff's concern was genuine and its motivation was the best interests of the State of Arizona to enhance the quality of education in the state by the selection of the most qualified president of one of the institutions of higher education.

17. However several of the Board's witnesses testified that there would be no harm to the individuals if the names of all persons originally on the list were disclosed. These opinions were available to the Board prior to the filing of this action. The court finds by clear and convincing evidence that the Board's refusal to disclose the entire list of 256 presidential candidates was arbitrary and capricious.

18. The Board's decision to file the lawsuit against the defendants on May 25, 1989 was not "legal action transacted by the plaintiff during a meeting held in violation" of the Open Meetings Law, A.R.S. § 38–431 *et seq.*

19. When it filed its Complaint for Declaratory Judgment in this action, the Board did not comply with its own Policy 1–109, which requires that no new litigation be initiated in the name of the Board without specific authorization by the Board. There was no emergency on May 25, 1989 that would have permitted initiation of litigation by Board Counsel pursuant to Policy 1–109 without the Board's authorization at a regularly noticed meeting.

20. With regard to the effect of the initiation of litigation contrary to the Board's policy, any amendment and/or supplementation of the statutes must be achieved elsewhere. Technically, the Board did not violate the Open Meetings Law but well may have violated the spirit

of the law. In addition, plaintiff has not achieved any recovery from its complaint; the issue of whether this litigation is null and void is now moot.

21. Insofar as the plaintiff's Cross–Motion for Summary Judgment requests a determination that 72–hour notice of the June 6, 1989 meeting was not required;

IT IS ORDERED granting Plaintiff's Cross–Motion for Summary Judgment.

IT IS FURTHER ORDERED that the Board disclose the entire list of names, addresses and employment status at the time their resumes were considered of all persons whose names were given to the Board by its search consultant, Heidrick & Struggles, for the ASU presidential search.

IT IS FURTHER ORDERED that the Board furnish the defendants with the resumes of any person not previously disclosed by the Board who was named in the June 30, 1989 *Arizona Republic* article written by Mary Jo Pitzl if that person was one of the 17 persons interviewed by the Board's search committee.

With regard to defendants' Application for Fees, it appearing that the total amount which the defendants in fact were obligated to pay to their counsel in this cause is $35,000.00.

IT IS ORDERED awarding to the defendants $35,000.00 in attorneys' fees and $3,317.65 in costs. Because defendants originally had agreed to pay their attorneys $35,000 plus whatever the Court might award in attorneys' fees, defendants are only obligated to pay attorneys' fees of $35,000. Similarly, under A.R.S. § 12–348(D)(2), defendants are entitled to no more than $35,000 because that is the amount they have "agreed to pay" their attorneys.

IT IS ORDERED awarded defendants as and for their attorneys' fees in this case the sum of $35,000.00