United States Court of Appeals,

Fifth Circuit.

No. 91–2305.

HODGE E. MASON and HODGE MASON MAPS, INC., Plaintiffs–Appellants,

v.

MONTGOMERY DATA, INC., ET AL., Defendants–Appellees.

July 28, 1992.

Appeals from the United States District Court for the Southern District of Texas.

Before SNEED[1], REAVLEY and BARKSDALE, Circuit Judges.

REAVLEY, Circuit Judge:

Hodge E. Mason, Hodge Mason Maps, Inc., and Hodge Mason Engineers, Inc. (collectively Mason) sued Montgomery Data, Inc. (MDI), Landata, Inc. of Houston (Landata), and Conroe Title & Abstract Co. (Conroe Title), claiming that the defendants infringed Mason's copyrights on 233 real estate ownership maps of Montgomery County, Texas. The district court initially held that Mason cannot recover statutory damages or attorney's fees for any infringement of 232 of the copyrights. The court later held that Mason's maps are not copyrightable under the idea/expression merger doctrine, and granted summary judgment for the defendants. We agree with Mason that the maps are copyrightable, so we reverse the district court's judgment and remand the case. But we agree with the district court that, if Mason proves that the defendants infringed his copyrights,[2] he can only recover statutory damages and attorney's fees for the infringements of one of the 233 maps.

I. BACKGROUND

---

[1]Senior Circuit Judge of the Ninth Circuit, sitting by designation.

[2]In addition to arguing that Mason's maps are not copyrightable, the defendants argued in their motions for summary judgment that their actions did not constitute actionable infringement of those copyrights. Although the district court did not address these arguments when it granted summary judgment, Landata asks us to affirm the summary judgment in the defendants' favor on these grounds. We decline this invitation, and remand the case for the district court to address these issues.

Between August 1967 and July 1969, Mason created and published 118 real estate ownership maps that, together, cover all of Montgomery County. The maps, which display copyright notices, pictorially portray the location, size, and shape of surveys, land grants, tracts, and various topographical features within the county. Numbers and words on the maps identify deeds, abstract numbers, acreage, and the owners of the various tracts. Mason obtained the information that he included on the maps from a variety of sources.[3] Relying on these sources, Mason initially determined the location and dimensions of each survey in the county, and then drew the corners and lines of the surveys onto topographical maps of the county that were published by the United States Geological Survey (USGS).[4] He then determined the location of the property lines of the real estate tracts within each survey and drew them on the USGS maps. Finally, Mason traced the survey and tract lines onto transparent overlays, enlarged clean USGS maps and the overlays, added names and other information to the overlays, and combined the maps and overlays to print the final maps. Mason testified that he used substantial judgment and discretion to reconcile inconsistencies among the various sources, to select which features to include in the final map sheets, and to portray the information in a manner that would be useful to the public. From 1970 to 1980, Mason revised the original maps and eventually published 115 new maps with copyright notices, for a total of 233 maps. Mason sold copies of his maps individually and in sets.

Mason's infringement claims are based on the defendants' use of his maps as part of a geographical indexing system that Landata created to continuously organize and store ever-changing title information on each tract in Montgomery County. To create this sytem, Landata purchased a

---

[3]These sources included tax, deed, and survey records from Montgomery County; data provided by the San Jacinto River Authority; survey records, maps, and abstracts of land titles from the Texas General Land Office; title data and subdivision information provided by Conroe Title; a map from the City of Conroe, Texas; and maps from the United States Coast and Geodetic Survey.

[4]The USGS has mapped much of the United States, including Montgomery County. Most private mapmakers, like Mason, use USGS topographical maps as starting points for their own maps. *See* David B. Wolf, *Is There any Copyright Protection for Maps after* Feist*?,* 39 J. COPYRIGHT SOC'Y USA 224, 226 (1992).

set of Mason's maps and reorganized them by cutting and pasting them into 72 map sheets. Landata then attached a transparent overlay to each of the 72 sheets, and depicted on these overlays numerous updates and corrections to the information on Mason's maps. Landata arbitrarily assigned identification numbers ("arb numbers") to tracts or areas within the county, and added these numbers to the overlays. Using this process, Landata created an inked mylar "master overlay" for each of the 72 reorganized map sheets. Landata then made sepia copies of the master overlays, and began registering ownership and other changes on the sepia copies from the hundreds of land grants that are recorded in the county each day. Using this system, the defendants are able to retrieve current ownership and other information on any tract by locating its arb number on the appropriate overlay and entering that number into a computer database that contains data on each tract.

In 1985, several title companies, including Conroe Title, incorporated MDI as a joint title plant. MDI and Landata then entered into a series of agreements under which Conroe Title and MDI's other shareholders can use Landata's system when they issue title insurance policies. On September 17, 1985, Landata asked Mason for permission to use his maps as part of its system, but Mason denied the request because Landata refused to pay a licensing fee. Landata then provided its products to MDI without Mason's permission. Each of MDI's shareholders purchased an original set of Mason's maps, and either MDI or the shareholders reorganized the maps from 118 to 72 map sheets according to Landata's specifications. Landata provided MDI with a set of sepia copies of the master overlays for each set of reorganized maps and with access to its computer database. Annually from 1982 through 1986, and again in 1989, Landata or MDI produced new, updated editions of the master overlays and provided new sepia copies to each of MDI's shareholders.

Mason registered the copyright for one of the original 118 maps in October 1968. After learning of Landata's use of his maps, Mason registered the copyrights for the remaining 117 original maps and the 115 revised maps between October and December 1987. Mason filed this suit in September 1988, claiming infringement of his 233 copyrights under 17 U.S.C. § 106, and seeking

statutory damages and attorney's fees under 17 U.S.C. §§ 504–05. In December 1989, the defendants sought a partial summary judgment that, even if Mason proves copyright infringement, 17 U.S.C. § 412 precludes an award of statutory damages or attorney's fees for any infringement of the 232 maps that Mason registered in 1987. The district court granted this motion on June 1, 1990. *Mason v. Montgomery Data, Inc.,* 741 F.Supp. 1282, 1287 (S.D.Tex.1990). In September 1990, Mason filed a motion for partial summary judgment that the defendants had infringed his copyrights. The defendants countered with motions for summary judgment in which they asserted that Mason's maps are not copyrightable and, even if they are, the defendants' use of the maps does not constitute infringement. The district court granted the defendants' motions after holding that Mason's maps are not copyrightable because the idea embodied in the maps is inseparable from the maps' expression of that idea. *Mason v. Montgomery Data, Inc.,* 765 F.Supp. 353, 356 (S.D.Tex.1991). The court dismissed Mason's claims with prejudice and awarded the defendants costs and attorney's fees.

## II. DISCUSSION

### A. THE COPYRIGHTABILITY OF MASON'S MAPS

#### 1. The Idea/Expression Merger Doctrine

The Copyright Act extends copyright protection to "original works of authorship fixed in any tangible medium of expression." 17 U.S.C.A. § 102(a) (West Supp.1992). The scope of that protection, however, is not unlimited. "In no case does copyright protection for an original work of authorship extend to any *idea,* ... regardless of the form in which it is described, explained, illustrated, or embodied in such work." *Id.* § 102(b) (emphasis added). Thus, while a copyright bars others from copying an author's original *expression* of an idea, it does not bar them from using the idea itself. "Others are free to utilize the "idea' so long as they do not plagiarize its "expression.' " *Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 741 (9th Cir.1971). In some cases, however, it is so difficult to distinguish between an idea and its expression that the two are said to merge. Thus, when there is essentially only one way to express an idea, "copying the "expression' will not be barred, since protecting the "expression' in such circumstances would confer a monopoly of the

"idea' upon the copyright owner free of the conditions and limitations imposed by the patent law."
*Id.* at 742.  By denying protection to an expression that is merged with its underlying idea, we
"prevent an author from monopolizing an idea merely by copyrighting a few expressions of it." *Toro
Co. v. R & R Products Co.,* 787 F.2d 1208, 1212 (8th Cir.1986).[5]

The district court applied these principles to the present case and concluded that "the problem
with the Hodge Mason maps is ... that [they] express the only pictorial presentation which could
result from a correct interpretation of the legal description and other factual information relied upon
by the plaintiffs in producing the maps." *Mason,* 765 F.Supp. at 355.  The court believed that,

> [t]o extend copyright protection to the Hodge Mason maps, which resulted from facts
> essentially in the public domain, would give the plaintiffs a monopoly over the facts.  In other
> words, anyone who has the desire and ability to correctly interpret the legal descriptions and
> toil through the factual information relied upon by the plaintiffs in creating their maps, would
> create a pictorial presentation so substantially similar to the plaintiffs['] that they could be
> accused of copyright infringement.  This result would clearly upset Congress' intent to balance
> the "competing concerns of providing incentive to authors to create and of fostering
> competition in such creativity."

*Id.* at 356 (quoting *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1253 (3rd
Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984)).  The court thus
concluded that "the plaintiffs' idea to create the maps, based on legal and factual public information,
is inseparable from its expression embodied within the maps, and hence not subject to copyright
protection." *Id.*

We agree with Mason that the district court erred in applying the merger doctrine in this case.

---

[5]Mason argues that application of the merger doctrine does not render a work
*uncopyrightable,* but rather prevents a finding of *infringement* of an otherwise copyrightable
work.  *See Kregos v. Associated Press,* 937 F.2d 700, 705 (2d Cir.1991) (Second Circuit "has
considered this so-called "merger' doctrine in determining whether actionable infringement has
occurred, rather than whether a copyright is valid").  But this court has applied the merger
doctrine to the question of copyrightability.  *See Kern River Gas Transmission Co. v. Coastal
Corp.,* 899 F.2d 1458, 1460 (5th Cir.) (because the idea and its expression embodied in plaintiff's
maps are inseparable, "the maps at issue are not copyrightable"), *cert. denied,* —— U.S. —— 111
S.Ct. 374, 112 L.Ed.2d 336 (1990).  In any event, because we find the merger doctrine
inapplicable in this case, the effect of its application is irrelevant.

To determine whether the doctrine is applicable in any case, the court must "focus on whether the idea is capable of various modes of expression." *Apple Computer,* 714 F.2d at 1253. Thus, the court must first identify the idea that the work expresses, and then attempt to distinguish that idea from the author's expression of it. If the court concludes that the idea and its expression are inseparable, then the merger doctrine applies and the expression will not be protected. Conversely, if the court can distinguish the idea from its expression, then the expression will be protected because the fact that one author has copyrighted one expression of that idea will not prevent other authors from creating and copyrighting their own expressions of the same idea. In all cases, "[t]he guiding consideration in drawing the line is the preservation of the balance between competition and protection reflected in the patent and copyright laws." *Herbert Rosenthal Jewelry,* 446 F.2d at 742.

The district court determined that Mason's idea, "which includes drawing the abstract and tract boundaries, indicating the ownership name, the tract size, and the other factual information" on a map of Montgomery County, was "to create the maps, based on legal and factual public information." *Mason,* 765 F.Supp. at 356. Mason argues that the court clearly erred in finding that this idea can be expressed in only one or a limited number of ways. We agree. The record in this case contains copies of maps created by Mason's competitors that prove beyond dispute that the idea embodied in Mason's maps is capable of a variety of expressions. Although the competitors' maps and Mason's maps embody the same idea, they differ in the placement, size, and dimensions of numerous surveys, tracts, and other features. The record also contains affidavits in which licensed surveyors and experienced mapmakers explain that the differences between Mason's maps and those of his competitors are the natural result of each mapmaker's selection of sources, interpretation of those sources, discretion in reconciling inconsistencies among the sources, and skill and judgment in depicting the information.[6]

---

[6]One of the experts, Pliny M. Gale, examined Mason's maps and the competitors' maps and concluded that:

> the assembly, graphic representation, and positioning of various records and features involves considerable skill, judgment and originality.

MDI argues that this evidence is irrelevant because there is no proof that Mason and his competitors obtained their information from the same sources. But the fact that different mapmakers with the same idea could reach different conclusions by relying on different sources only supports our result. Whether Mason and his competitors relied on different sources, or interpreted the same sources and resolved inconsistencies among them differently, or made different judgments as to how to best depict the information from those sources, the differences in their maps confirm the fact that the idea embodied in Mason's maps can be expressed in a variety of ways. By selecting different sources, or by resolving inconsistencies among the same sources differently, or by coordinating, arranging, or even drawing the information differently, other mapmakers may create—and indeed have created—expressions of Mason's idea that differ from those that Mason created.[7]

---

> ... The differences I note between the Mason maps and the other maps which I have examined are to be expected because of the numerous interpretations of records, individual judgments, and map base selection which must be taken into account when producing an ownership map based on a large number of instruments spanning over 100 years of development.
>
> ....
>
> In my inspection of the maps, I found that the Mason map includes many features which are unique to the graphic representations selected by Mason, and which do not appear in any public record information.

Gale Aff. at 2–4. Another mapmaker, Milton R. Hanks, stated:

> In compiling a map as detailed and complex as the Mason maps of Montgomery County, the mapmaker will necessarily make many individual judgments in placing various features from various sets of records onto a single map.
>
> ....
>
> ... When the Mason map is overlaid with the Tobin map at the same scale ..., many differences in placement of various features and surveys are readily observed. The differences between the two maps are exactly the sort of differences that I would expect to observe between two independently produced maps based on the same ancient records. The reason for the differences is that a large number of independent judgments must be made in any large-scale mapping project of this type.

Hanks Aff. at 2, 5.

[7]Citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* —— U.S. ——, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), the defendants contend that an author's selection, coordination, and

Finally, the defendants contend that this court's decision in *Kern River Gas Transmission Co. v. Coastal Corp.,* 899 F.2d at 1458, requires application of the merger doctrine in this case. *Kern River* concerned the copyrightability of maps on which Kern River Gas Transmission Company (Kern River) depicted the location that it proposed for construction of a gas pipeline. The idea at issue in *Kern River* was simply the placing on a map of Kern River's certain "proposed location for a prospective pipeline." *Id.* at 1464. This court concluded that that idea merged with Kern River's expression because there was only one way to effectively express that idea. *Id.*

The defendants argue that the merger doctrine applies in this case because drawing lines on a public map is the only way to depict the locations of surveys and boundary lines in Montgomery County, just as it was the only way to depict the location of a pipeline in *Kern River.* But the distinction between *Kern River* and this case is not in the methods available for depicting an object's location on a map, but in the *ideas* that the maps in the two cases embody. We cannot determine whether an idea is capable of a variety of expressions until we first identify what that idea is. A court's decision whether to apply the merger doctrine often depends on how it defines the author's idea. For this reason, in defining the idea the court should be guided by "the balance between competition and protection reflected in the patent and copyright laws." *Herbert Rosenthal Jewelry,* 446 F.2d at 742.[8]

---

arrangement of facts merit consideration in the decision whether a work is "original," but they are irrelevant to the application of the merger doctrine. We disagree. The question in *Feist* was whether a compilation of facts contained sufficient originality to be copyrightable. The Court explained that, although the facts contained in a compilation can never be original, the author's selection, arrangement, and coordination of those facts may be. *Id.* 111 S.Ct. at 1288–89. But nothing in *Feist* suggests that those factors are inapplicable to the question whether an idea is subject to a variety of expressions. As we have explained, it is precisely because mapmakers who seek to express the idea embodied in Mason's maps must make choices as to selection, coordination, and arrangement that they can express that idea in a variety of ways.

[8]Thus, as one commentator states:

> In copyright law, an "idea" is not an epistemological concept, but a legal conclusion prompted by notions—often unarticulated and unproven—of appropriate competition. Thus, copyright doctrine attaches the label "idea" to aspects of works which, if protected, would (or, we fear, might) preclude, or render too expensive, subsequent authors' endeavors.

We focus in this case on an earlier point in the mapping process, a point prior to the selection of information and decisions where to locate tract lines. The idea here was to bring together the available information on boundaries, landmarks, and ownership, and to choose locations and an effective pictorial expression of those locations. That idea and its final expression are separated by Mason's efforts and creativity that are entitled to protection from competitors. The evidence in this case demonstrates that a mapmaker who desires to express the idea of depicting the location and ownership of property in Montgomery County in map form must select information from numerous sources, reconcile inconsistencies among those sources, and depict the information according to the mapmaker's skill and judgment. Although Mason sought to depict the information accurately, the conflicts among the sources and the limitations inherent in the process of representing reality in pictorial map form required him to make choices that resulted in independent expression. Extending protection to that expression will not grant Mason a monopoly over the idea, because other mapmakers can express the same idea differently. The protection that each map receives extends only to its original *expression,* and neither the facts nor the idea embodied in the maps is protected. "[T]he facts and ideas ... are free for the taking.... "[T]he very same facts and ideas may be divorced from the context imposed by the author, and restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas." *Feist,* 111 S.Ct. at 1289 (quoting Jane C. Ginsburg, *Creation and Commercial Value: Copyright Protection of Works of Information,* 90 COLUM.L.REV. 1865, 1868 (1990)).

For these reasons, we conclude that the district court erred by applying the merger doctrine in this case. Because the idea embodied in Mason's maps can be expressed in a variety of ways, the merger doctrine does not render Mason's expression of that idea uncopyrightable.

*2. The "Originality" Requirement*

---

Jane C. Ginsburg, *No "Sweat"? Copyright and Other Protection of Works of Information after* Feist v. Rural Telephone, 92 COLUM.L.REV. 338, 346 (1992) (footnotes omitted).

Landata contends that, even if the merger doctrine does not apply, Mason's maps are uncopyrightable because they are not "original" under *Feist*. Although the district court applied the merger doctrine to hold that Mason's maps are not copyrightable, it found that "the problem with the Hodge Mason maps is not a lack of originality." *Mason,* 765 F.Supp. at 355. We agree that Mason's maps are original. Originality does not require "novelty, ingenuity, or aesthetic merit." H.R.REP. No. 1476, 94th Cong., 2d Sess. 51 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5664; *see also Feist,* 111 S.Ct. at 1287. Instead, originality "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist,* 111 S.Ct. at 1287 (citing 1 M. Nimmer & D. Nimmer, COPYRIGHT § 2.01[A]–[B] (1990)). The parties do not dispute Mason's claim that he independently created his maps, but Landata contends that they do not possess the degree of creativity necessary to qualify them as original under *Feist*.

Mason's maps pass muster under *Feist* because Masons' selection, coordination, and arrangement of the information that he depicted are sufficiently creative to qualify his maps as original "compilations" of facts.[9] Under the originality standard, bare facts are never copyrightable "because facts do not owe their origin to an act of authorship." *Id.* at 1288. A compilation of facts, however, may be copyrightable if the author made choices as to "which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers." *Id.* at 1289. The author's selection, coordination, and arrangement of facts, however, are protected only if they were "made independently ... and entail a minimal degree of creativity." *Id.*

In *Feist,* the Court held that the defendant, who copied a list of names, towns, and telephone numbers from the white pages of the plaintiff's telephone directory, did not copy anything that was "original" to the plaintiff. *Id.* at 1296. The Court explained that the plaintiff's selection of facts to

---

[9]A compilation "is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101.

publish—the name, town, and telephone number of each person who applied for telephone service—"lacks the modicum of creativity necessary to transform mere selection into copyrightable expression." *Id.* And the plaintiff's arrangement of these facts, which involved "nothing more than list[ing] ... [the] subscribers in alphabetical order," is "not only unoriginal, it is practically inevitable." *Id.* at 1297. Because the plaintiff "simply [took] the data provided by its subscribers and list[ed] it alphabetically by surname ..., [t]he end product is a garden-variety white pages directory, devoid of even the slightest trace of creativity." *Id.* at 1296.

But the evidence in this case demonstrates that Mason exercised sufficient creativity when he created his maps. In his deposition and affidavit, Mason explained the choices that he independently made to select information from numerous and sometimes conflicting sources, and to depict that information on his maps.[10] Mason's compilation of the information on his maps involved creativity that far exceeds the required minimum level.

Mason's maps also possess sufficient creativity to merit copyright protection as pictorial and graphic works of authorship. Historically, most courts have treated maps solely as compilations of facts. *See* Wolf, *supra* note 4, at 227. The Copyright Act, however, categorizes maps not as factual

---

[10]Mason explained in his deposition:

> In 1967, I placed all of the survey lines in the county on the [USGS] topo[graphical] maps. Now, you just don't draw it on there. I placed each corner of each survey separately; each line of each survey separately ..., and each—the positioning of each survey corner, each survey line was a matter of judgment. You just can't buy a map, of any source I know, that has them all on there correctly.... So, each line was placed on there. I made a judgment on each corner, each line for every survey. Then, the same system worked for the tracts within the survey; and I detailed on the topo map the individual real property lines within each survey.

In his affidavit, Mason explained that he chose to "locate each individual survey on the topographic maps independently of each of the other surveys," to place the oldest titled grants on the topographic maps first, and then add the more recent surveys proceeding from the earliest grants, and to position the surveys on the USGS maps "not only by examining the record facts, but also by using topographic features shown on U.S.G.S. maps, especially the features from the U.S.G.S. map commonly found at property boundaries as a check on [his] placement of the survey and real property boundaries." Mason Aff. at 2.

compilations but as "pictorial, graphic, and sculptural works"—a category that includes photographs and architectural plans. 17 U.S.C.A. § 101 (West Supp.1992). Some courts have recognized that maps, unlike telephone directories and other factual compilations, have an inherent pictorial or photographic nature that merits copyright protection. *See, e.g., Rockford Map Publishers, Inc. v. Directory Service Co.,* 768 F.2d 145, 149 (7th Cir.1985) ("Teasing pictures from the debris left by conveyancers is a substantial change in the form of the information. The result is copyrightable...."), *cert. denied,* 474 U.S. 1061, 106 S.Ct. 806, 88 L.Ed.2d 781 (1986); *United States v. Hamilton,* 583 F.2d 448, 451 (9th Cir.1978) ("Expression in cartography is not so different from other artistic forms seeking to touch upon external realities that unique rules are needed to judge whether the authorship is original."). We agree with these courts. As Wolf explains in his article:

> It is true that maps are factual compilations insofar as their subject matter is concerned. Admittedly, most maps present information about geographic relationships, and the "accuracy" of this presentation, with its utilitarian aspects, is the reason most maps are made and sold. Unlike most other factual compilations, however, maps translate this subject-matter into pictorial or graphic form.... Since it is this pictorial or graphic form, and not the map's subject matter, that is relevant to copyright protection, maps must be distinguished from non-pictorial fact compilations.... A map does not present objective reality; just as a photograph's pictorial form is central to its nature, so a map transforms reality into a unique pictorial form central to its nature.

Wolf, *supra* note 4, at 239–40.

The level of creativity required to make a work of authorship original "is extremely low; even a slight amount will suffice." *Feist,* 111 S.Ct. at 1287. We think that the process by which Mason, using his own skill and judgment, pictorially portrayed his understanding of the reality in Montgomery County by drawing lines and symbols in particular relation to one another easily exceeds that level.

Because Mason's maps possess sufficient creativity in both the selection, coordination, and arrangement of the facts that they depict, and as in the pictorial, graphic nature of the way that they do so, we find no error in the district court's determination that Mason's maps are original.

B. AVAILABILITY OF STATUTORY DAMAGES

Mason sought statutory damages rather than actual damages. The district court held that section 412 of the Copyright Act precludes an award of statutory damages (and attorney's fees) for any alleged infringement of all but one of Mason's maps. *See Mason,* 741 F.Supp. at 1285–87. Mason calls that holding error, but we agree with the district court. Section 412 provides that:

> no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for ... (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C.A. § 412 (West Supp.1992). Mason argues that Congress' use of the phrase "for any infringement" in this section reveals its intent that courts treat each of a defendant's infringing acts separately and deny statutory damages only for those specific infringing acts that commenced prior to registration. Thus, Mason argues, section 412 allows him to recover statutory damages and attorney's fees for any infringement that the defendants commenced *after* he registered the copyrights, even though they commenced other, separate infringements of the same work prior to registration. The district court rejected this argument because it interpreted the term "infringement" to mean all of a defendant's acts of infringement of any one work. Thus, the court interpreted "the words "commencement of infringement' to mean the first act of infringement in a series of on-going separate infringements." 741 F.Supp. at 1286.

We find section 412 to be ambiguous and open to either interpretation. But we find support for the district court's interpretation in the legislative history of section 412. The House Report explains that "clause (2) [of section 412] would generally deny an award of [statutory damages and attorney's fees] *where infringement takes place before registration.*" H.R.REP. No. 1476 at 158, *reprinted in* 1976 U.S.C.C.A.N. at 5659, 5774 (emphasis added). In contrast to the "for any infringement" language of section 412, this language reveals Congress' intent that statutory damages be denied not only for *the particular infringement* that a defendant commenced before registration, but for all of that defendant's infringements of a work if one of those infringements commenced prior

to registration.

In addition to the legislative history of section 412, we find support for the district court's interpretation in 17 U.S.C. § 504. We look to section 504 for assistance in understanding section 412 because section 412 bars an award of statutory damages "as provided by section 504." Section 504 provides that:

> the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, *an* award of statutory damages for *all* infringements involved in the action with respect to any *one* work, for which any *one* infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $500 or more than $20,000 as the court considers just.

17 U.S.C.A. § 504(c)(1) (West Supp.1992) (emphasis added). Under this section, the total number of "awards" of statutory damages (each ranging from $500 to $20,000) that a plaintiff may recover in any given action depends on the number of *works* that are infringed and the number of individually liable *infringers,* regardless of the number of *infringements* of those works.[11] So if a plaintiff proves that *one* defendant committed *five* separate infringements of *one* copyrighted work, that plaintiff is

---

[11]The legislative history of section 504 is particularly direct on this point:

> Although ... an award of minimum statutory damages may be multiplied if separate works and separately liable infringers are involved in the suit, a single award ... is to be made "for all infringements involved in the action." A single infringer of a single work is liable for a single amount ..., no matter how many acts of infringement are involved in the action and regardless of whether the acts were separate, isolated, or occurred in a related series.
>
> ....
>
> ... Where the infringements of one work were committed by a single infringer acting individually, a single award of statutory damages would be made.... However, where separate infringements for which two or more defendants are not jointly liable are joined in the same action, separate awards of statutory damages would be appropriate.

H.R.REP. No. 1476 at 162, *reprinted in* 1976 U.S.C.C.A.N. at 5659, 5778. As the D.C. Circuit explained, "[b]oth the text of [section 504(c)(1) ] and its legislative history make clear that statutory damages are to be calculated according to the number of works infringed, not the number of infringements.... [O]nly one penalty lies for multiple infringements of one work." *Walt Disney Co. v. Powell,* 897 F.2d 565, 569 (D.C.Cir.1990).

entitled to only one award of statutory damages ranging from $500 to $20,000. And if a plaintiff proves that *two* different defendants each committed *five* separate infringements of *five* different works, the plaintiff is entitled to ten awards, not fifty. It would be inconsistent to read section 504 to include all of one defendant's infringements of one work within "an award of statutory damages," and then read section 412 to treat each infringement separately for purposes of barring that award.

Moreover, section 504 provides that the plaintiff may elect to recover an award of statutory damages for *all* of one defendant's infringements of any one work "*instead of* actual damages and profits." Thus, if all of one defendant's infringements commenced after registration, the plaintiff may not elect to recover statutory damages for some of those infringements and actual damages for the rest. *See* H.R.REP. No. 1476 at 161, reprinted in 1976 U.S.C.C.A.N. at 5659, 5777 ("Recovery of actual damages and profits under section 504(b) or of statutory damages under section 504(c) is alternative."). Under Mason's argument, a plaintiff could recover actual damages for infringements that a defendant commenced before registration, and still recover statutory damages for infringements of the same work that the same defendant commenced after registration. This argument must fail because "an award of statutory damages"—which section 504 giveth and section 412 taketh away—encompasses *all* of one defendant's infringements of one work.

Finally, our conclusion accords with the purpose of section 412. Congress included section 412 in the Copyright Act of 1976 because "[c]opyright registration for published works, which is useful and important to users and the public at large, would no longer be compulsory [under the 1976 Act], and should therefore be induced in some practical way." H.R.REP. No. 1476 at 158, *reprinted in* 1976 U.S.C.C.A.N. at 5659, 5774. Denying an "award of the special or "extraordinary' remedies of statutory damages or attorney's fees where ... infringement commenced after publication and before registration" encourages early registration of copyrights. *Id.* As one court has noted, "[t]he threat of such a denial would hardly provide a significant motivation to register early if the owner of the work could obtain those remedies for acts of infringement taking place after a belated registration."

*Singh v. Famous Overseas, Inc.,* 680 F.Supp. 533, 536 (E.D.N.Y.1988).

We thus conclude that a plaintiff may not recover an award of statutory damages and attorney's fees for infringements that commenced after registration if the same defendant commenced an infringement of the same work prior to registration. Mason published his 233 maps between 1967 and 1980, and registered the copyright in one map in October 1968. By the time he registered the remaining 232 copyrights in 1987, t he defendants had reorganized Mason's maps and created and used the overlays and computer database. As to each work and each defendant, the alleged acts of infringement that could give rise to an award of statutory damages had commenced prior to registration of 232 of the works. We thus uphold this ruling of the district court. If Mason proves infringement, he may elect to recover statutory damages and attorney's fees only for the infringements of the map that he registered in 1968.

C. DEFENDANTS' COSTS AND ATTORNEY'S FEES

Because we reverse the district court's final judgment, the defendants are not presently entitled to costs and attorney's fees as "prevailing parties." *See* 17 U.S.C. § 505. We thus reverse the court's amended final judgment of June 5, 1991 that awarded costs and attorney's fees to the defendants.

III. CONCLUSION

We REVERSE the court's judgments dismissing plaintiff's action and awarding the defendants costs and at torney's fees, and we REMAND the case for further proceedings consistent with this opinion.

REVERSED and REMANDED.