**MID AMERICA TITLE COMPANY, Plaintiff,**

v.

**James F. KIRK, Defendant.**

**No. 86 C 2853.**

United States District Court, N.D. Illinois, Eastern Division.

Oct. 19, 1994.

Robert Edward Wagner, Alan L. Barry, Wallenstein, Wagner & Hattis, Ltd., Chicago, IL, Amy L.H. Rockwell, Baxter Travenol Laboratories, Inc., Deerfield, IL, for Mid America Title Co.

Thomas L. Browne, Thomas P. McGarry, Hinshaw & Culbertson, Chicago, IL, Thomas Henry James, Shriver & O'Neill, Rockford, IL, Gary W. Leydig, Levin, McParland, Phillips, Leydig & Haberkorn, Chicago, IL, for James F. Kirk.

James F. Kirk, pro se.

Howard Patrick Morris, William V. Johnson, Johnson & Bell, Ltd., Chicago, IL, for Attorney's Title Guar. Fund, Inc.

Frank J. McGarr, pro se.

## MEMORANDUM OPINION AND ORDER

PALLMEYER, United States Magistrate Judge.

Plaintiff Mid America Title Company ("Mid America") and Defendant James Kirk, an attorney associated with the Attorneys' Title Guaranty Fund, are both in the business of performing title searches and preparing title insurance commitments for real estate in Illinois. In the spring of 1985, Mid America prepared a title insurance commitment on behalf of a lender for a parcel of real estate in Will County, Illinois. Kirk later prepared a title commitment for his clients, the purchasers of the property. At the time Kirk prepared his commitment, his staff had a copy of the commitment that had been prepared by Mid America. Kirk's commitment contains material apparently copied from the Mid America commitment. Mid America registered its title insurance commitment for the Will County property with the U.S. Copyright Office on June 4, 1985. In this lawsuit, filed in April 1986, Mid America charges Kirk with violating Mid America's copyright in its title insurance commitment. Kirk contends that Mid America's

title commitment is a compilation of facts which does not qualify for copyright protection as a matter of law. Now before the court are the parties' cross-motions for summary judgment.[1]

## STATEMENT OF FACTS

Plaintiff Mid America Title Company ("Mid America") provides "real estate settlement services," including title searches, title insurance, and escrow services to buyers, sellers, and mortgage lenders. (Statement of Material Facts as to Which There is no Genuine Issue in Support of Mid America's Motion for Summary Judgment (hereinafter, "Mid America's Rule 12(M) Statement") ¶ 3.) Mid America also acts as a title insurance agent and will create and issue a title insurance commitment for a parcel of property at the request of a seller, buyer, or lender. (*Id.* ¶¶ 2, 4.) Mid America determines whether it will issue a title insurance commitment on the basis of a land title search. (*Id.* ¶ 4.) Mid America's title commitments are writings which "compris[e] text and compilation of selected land title data." (Mid America's Rule 12(M) Statement ¶ 6.)

Defendant James F. Kirk ("Kirk"), an Illinois attorney, is a member of the Attorneys' Title Guaranty Fund, Inc. ("ATGF"), an organization that underwrites title insurance. (Mid America's Rule 12(M) Statement ¶ 7, 8.) As an ATGF member, Kirk is authorized to perform title searches and to prepare and issue commitments to issue title insurance on behalf of ATGF. (Kirk's Answers to Plaintiff's First Set of Requests for Admissions, Ex. B to Mid America's Statement of Material Facts as to Which There is a Genuine Issue in Opposition to Kirk's Cross–Motion for Summary Judgment (hereinafter "Mid America's Rule 12(N) Statement"), ¶ 3.) In 1985, Kirk represented George and June Schaaf in a real estate transaction in which the Schaafs purchased a parcel of land in Frankfort, Illinois from Richard and Violet Wagner. (Mid America's Rule 12(M) Statement ¶ 10.)

On April 19, 1985, the Horizon Federal Savings Bank ("Horizon") placed an order with Mid America for title insurance policies for the Wagner property. (*Id.* ¶ 11.)[2] Mid America did, in fact, prepare its Title Commitment No. 125266 for the property. Thaddeus M. Bond, Sr., Mid America's president, asserts that the commitment "was developed through a manual search of land title records in Will County." (Declaration of Thaddeus M. Bond, Sr., Ex. C to Mid America's Rule 12(M) Statement, ¶ 7.) The fourth page of the Commitment bears the words, "Copyright 1985, Mid America Title Company." (Commitment for Title Insurance, Ex. E to Mid America's Rule 12(M) Statement.) According to Thaddeus Bond, the original and a

---

1. This case was originally filed in August 1986. On Defendant's motion to dismiss, District Judge James Alesia concluded that Plaintiff had not adequately identified the original elements of its title commitment that were allegedly infringed, and that, in any event, Plaintiff was unable to prove that Defendant had copied anything that was original. *See Mid America Title Co. v. Kirk,* 991 F.2d 417, 419 (7th Cir.) *cert. denied,* —— U.S. ——, 114 S.Ct. 346, 126 L.Ed.2d 310 (1993) (hereinafter, *"Kirk I"*). The Seventh Circuit concluded that such a determination was not appropriate on a motion attacking the sufficiency of the pleadings, concluded that Mid America had adequately *pleaded* that it had a copyrightable interest in its data compilation, and remanded for development of an evidentiary record on the question of whether Mid America could prove that claim. *Id.* at 422–23. Following remand, the parties consented to the exercise of jurisdiction by Magistrate Judge Bernard Weisberg. After Judge Weisberg's death, the case was reassigned to this court and the parties again executed consents. The parties have now

accepted the Seventh Circuit's invitation to file cross-motions for summary judgment, supported by affidavits, deposition transcripts, and additional exhibits.

2. Kirk denies this assertion but cites in support of his denial only his own hearsay testimony that someone at Horizon had told him that they had not yet ordered a title commitment and would order such a commitment from Attorneys' Title Guaranty Fund. In response to Kirk's own motion for summary judgment, Mid America has submitted a copy of Horizon's written application for a title commitment. (Ex. A to Mid America's Rule 12(N) Statement.) As Thaddeus Bond testified, Mid America has a practice of beginning the process of performing a title search and preparing a title insurance commitment at the lender's request even where the buyer of the property has not yet authorized or contracted with Mid America for a title insurance commitment. (Deposition of Bond, Ex. 7 to Kirk's Memorandum, at 124.)

copy of the commitment was mailed to Horizon, but Horizon cancelled the order. (Bond Declaration ¶¶ 8, 9.)[3]

The Schaafs never requested a title commitment from Mid America. They did order such a commitment from Kirk. (Defendant's Statement of Material Facts as to Which There is no Genuine Issue in Support of Defendant's Cross Motion for Summary Judgment (hereinafter, "Kirk's Rule 12(M) Statement") ¶ 2.) Kirk and his assistant, Cynthia Peri, explained that, when preparing a title commitment for property in Will County, they order a title search from the law firm of Davis, Varsek and Dystrup. (Deposition of Cynthia Peri, Ex. G to Mid America's Rule 12(M) Statement, at 6, 12–13; Deposition of James F. Kirk, Ex. D to Mid America's Rule 12(M) Statement, at 33.) Ms. Peri uses the data she receives from Davis, Varsek to prepare a title commitment which is then reviewed, approved, and signed by Kirk. (Dep. of James F. Kirk, Ex. D to Mid America's Rule 12(M) Statement, at 14–16.) By letter dated April 26, 1985 directed to the attention of "JoAnn," Ms. Peri requested a title search on the Frankfort property. (Letter from Peri to "JoAnn," 4/26/85, Ex. 12 to Memorandum of James F. Kirk in Opposition to Mid America's Motion for Summary Judgment and in Support of his Cross–Motion for Summary Judgment (hereinafter, "Kirk's Memorandum").)

Ms. Peri had not received the results of the title search by early May. Knowing she needed the information in time for a May 7 closing date, Ms. Peri telephoned JoAnn and received an oral report of the results of that search. (Peri Dep., Ex. G to Mid America's Rule 12(M) Statement, at 23.) Mid America asserts that Ms. Peri only received data concerning the taxes, mortgage, and owner of the property; in fact, however, Ms. Peri testified that "[t]he only thing she [JoAnn] *didn't* have on the first day I called her was judgment and lien searches on the buyer and seller, I think." (Peri Dep., Ex. 5 to Kirk's

Memorandum, at 19 (emphasis supplied).) Although neither party explains the circumstances, it is undisputed that at some time prior to the closing, Mid America's title commitment came into Kirk's possession. Ms. Peri recalled that she was "sure it was there prior to the close." (Peri Dep., Ex. G to Mid America's Rule 12(M) Statement, at 17.) On or about May 7, 1985, Kirk issued a title commitment for the property bearing ATGF Commitment No. 774156. (ATGF Title Commitment, Ex. F to Mid America's Rule 12(M) Statement.) Ms. Peri distributed the ATGF title commitment some time prior to the May 7, 1985 closing date. (Mid America's Rule 12(M) Statement ¶ 28.) Ms. Peri acknowledged that she "probably" had the Mid America commitment open on her desk at the time she prepared the ATGF Commitment. (Peri Dep., Ex. G to Mid America's Rule 12(M) Statement, at 27.)

The ATGF commitment contains erroneous information—a mortgage recording date one day later than the actual mortgage date—that Mid America had "planted" in its own title commitment in an effort to detect copiers. (Mid America's Rule 12(M) Statement ¶¶ 31, 32; Bond Declaration ¶ 10.) The written title search report that Kirk received from Davis, Varsek & Dystrup did not contain the error. (Mid America's Rule 12(M) Statement ¶ 33, 34.) Like the Mid America commitment, the title insurance commitment produced by ATGF bears an "effective date" of March 27, 1985; the "effective date" that appears on the written title search report from Davis, Varsek and Dystrup is April 15, 1985. (*Id.* ¶¶ 35–37.) Ms. Peri testified that "[e]vidently I picked it [the March 27 date] up off of Mid America," conduct she attributed to "the kind of chaos that was at the office at that time...." (Peri Dep., Ex. G to Mid America's Rule 12(M) Statement, at 26.) Both the Mid America Commitment and the ATGF commitment contain, in identical language exceptions to the insurance coverage.[4]

---

3. Kirk denies the cancellation occurred, citing the same hearsay testimony referred to earlier.

4. Specifically, both commitments make exceptions for "Rights of the State of Illinois, the municipality and the public in and to that part of the property which may fall in streets and high-

ways" and for "Rights of way for drainage ditches, tiles, feeders and laterals, if any." Mid America Commitment, Ex. E to Mid America's Rule 12(M) Statement, at p. 2 ¶¶ 3, 4; ATGF Commitment, Ex. F to Mid America's Rule 12(M) Statement, at p. 2 ¶¶ 7, 8.

The written report from Davis, Varsek and Dystrup does not contain this information. (Mid America's Rule 12(M) Statement ¶ 41.) Both the Mid America Commitment and the ATGF commitment contain identical information concerning taxes owed on the property and a mortgage lien against the property. (*Id.* ¶¶ 42–44.) Mid America claims it lost $865.00, the price it billed Horizon for the title commitment. (*Id.* ¶ 46.) Kirk admits he collected $904.50 for the ATGF title commitment. (*Id.* ¶ 47.)

The parties are in substantial agreement concerning the basic function of running title searches and performing title commitments. As James Kirk explains, a title insurance commitment is an offer to provide a policy of title insurance, which is ordinarily subject to all interests which affect title to a piece of property. (Affidavit of James F. Kirk, Ex. 2 to Kirk Memorandum, ¶ 7.) These interests, which are matters of public record, consist of "any encumbrances, mortgages, liens, assessments, litigation or wills involving the property and judgments." (*Id.* ¶ 8.) Title commitments should make reference to every encumbrance that appears in the public records, including property tax information, all liens and mortgages, and the names and marital status of the current owner(s). (*Id.* ¶¶ 9, 10, 11.) Indeed, Kirk observed that he had "never seen a properly prepared title commitment during [his] years of practice that did not contain a legal description of the property, the property index number, general taxes on the property and their status, mortgages on the property and any information of record with respect to such mortgages and the current owners of record on the property and whether they are married." (*Id.* ¶ 12.)

Andrew C. Dystrup, a principal in the law firm that Kirk called upon to perform a title search on the Schaaf property, provided a similar description of the process for performing a title search. (Affidavit of Andrew C. Dystrup, Ex. 3 to Kirk Memorandum, at ¶¶ 12–16.) Mr. Dystrup added that it is often a clerk in his office who gathers information for the title search (*Id.* ¶ 17), pursuant to these instructions:

The clerk who completes the search is instructed to simply write down every less than fee "interest" which affects a piece of property as well as identify the record owner of the property. No judgment or discretion is involved in identifying and writing down this information.

(*Id.* ¶ 18.)

Thaddeus M. Bond, President of Mid America, describes the work performed by a "trained title searcher" similarly as a search for facts including, but not limited to, "the identification of all grantors and grantees in the chain of title; the legal description; encumbrances such as mortgages, trust deeds, as well as releases and assignments of those encumbrances; judgments; federal and state tax liens against persons in the chain of title, as well as releases of those liens; divorces, probate matters and bankruptcies against persons in the chain of title; special assessments; drainage district assessments; and real estate tax information." (Declaration of Bond, Ex. L to Mid America's Reply Memorandum, ¶ 3.) After the search is completed, Bond explained, the information is given to the title examiner who prepares a commitment for title insurance by selecting "those facts which in the exercise of the examiner's judgment need to be known by a lender or a purchaser of real estate." (*Id.* ¶ 5.) Bond acknowledges, however, that it is only "those facts that do not affect the property or liens which have been properly released" that are excluded from the title commitment. (*Id.*) Bond thus does not challenge Kirk's assertion that all facts that do affect the property should be included. Bond's declaration continues with a description of the decisions made by the title searcher in preparing the Schaaf title commitment, decisions that Mid America contends reflected judgment and creativity.

On June 4, 1985, Mid America filed a registration for its title insurance commitment No. 125266 with the U.S. Copyright Office. (Certificate of Copyright Registration Nos. 1–786–703 and 1–844–563, Exs. A and B to Mid America's Rule 12(M) Statement.) Kirk contends that the facts contained in the Mid America commitment are matters of public record. (Defendant's

Statement of Material Facts as to Which There is no Genuine Issue in Support of Defendant's Cross Motion for Summary Judgment (hereinafter, "Kirk's Rule 12(M) Statement") ¶ 1.) Mid America admits this, except that Mid America asserts that it owns and leases access to certain maps (the "Sidwell maps") which are the source of the information that requires an exclusion in the commitment for "[r]ights of the State of Illinois, the municipality and the public in and to that part of the property which may fall in streets and highways." (Mid America's Rule 12(M) Statement ¶ 1.)

As Mid America has admitted, further, it is common industry practice for title insurance companies to use an earlier policy or commitment as a "starter" when preparing a commitment, and for a title company to "just come forward"—that is, search for title information only from the effective date of the "starter policy" to the present. (*Id.* ¶ 6.) Mid America does not deny that Kirk himself did not use the Mid America Commitment in preparing the ATGF commitment. (*Id.* ¶ 7.) In addition, Mid America admits that the "arrangement of facts" in the paragraph from the ATGF commitment concerning real estate tax information is "completely different" from the ·analogous paragraphs in the Mid America title commitment. (*Id.* ¶ 12.) Similarly, Mid America admits that the arrangement of facts in the paragraph in the ATGF Commitment concerning the existing mortgage on the property is "completely different" from the arrangement of facts in the corresponding paragraph of the Mid America Commitment. (*Id.* ¶ 14.) Mid America acknowledges, in addition, that there are differences between the two policies in the language identifying the owners of the property and in the language introducing the property description. (*Id.* ¶ 13.) Mid America admits that the ATGF title commitment contains certain paragraphs that do not appear in any form in the Mid America Commitment; specifically, the ATGF commitment sets forth additional exceptions to title insurance coverage unless additional materials—a survey and evidence of coverage against mechanics' liens—are provided. (*Id.* ¶ 16.) In addition, certain tax information provided in the search prepared by the Davis, Varsek firm

appears in the ATGF commitment but not in Mid America's Commitment. (*Id.* ¶ 18.)

## DISCUSSION

Plaintiff Mid America seeks a summary judgment in its favor on the issue of infringement. Kirk argues that he is entitled to judgment as a matter of law because the undisputed facts demonstrate that the material he allegedly copied was not copyrightable.

### A. Standards for Summary Judgment

 Summary judgment may be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A party moving for summary judgment bears the initial burden of informing the district court, and the non-moving party, of the basis for its motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This requirement necessitates that the moving party point to those portions of the record or of the nonmovant's case which it believes demonstrate the absence of a genuine issue of material fact. *Id.* Once the moving party has carried its initial burden of pointing to defects in the nonmoving party's case, the nonmoving party must come forward with evidence sufficient to create a material issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

 The standard for granting summary judgment "mirrors" the standard for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). That is, summary judgment is appropriate when there can be but one reasonable conclusion as to the verdict. *Id.* In making the determination whether reasonable persons could differ as to the evidence, the court must consider whether the nonmovant has put forth sufficient evidence to satisfy the

substantive evidentiary standard for its case. *Id.* at 255, 106 S.Ct. at 2513–14.

### B. *Burden of Proof; the Feist Publications Decision*

Plaintiff has the burden of establishing copyright infringement, and must prove two essential elements to meet that burden: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991).

■ In *Feist Publications,* the Supreme Court addressed the scope of copyright protection afforded to factual compilations. Rural Telephone Service Company charged that Feist Publications infringed Rural's copyright when Feist published a white pages telephone directory using names and telephone numbers copied from a directory published by Rural. The Supreme Court concluded that Rural was not entitled to a copyright in its directory and reversed a summary judgment for Rural. In reaching that conclusion, the Court emphasized that "[o]riginality is a constitutional requirement for copyright protection. . . ." 499 U.S. at 345, 111 S.Ct. at 1287. Facts of whatever kind—scientific, historical, biographical, and news of the day—"whether alone or as a part of a compilation, are not original and therefore may not be copyrighted." *Id.* at 350, 111 S.Ct. at 1290. A compilation of facts may be copyrightable, however, "if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement." *Id.* at 350–51, 111 S.Ct. at 1290. Thus, a compiler's selection, arrangement and coordination, if original, are the only protectable elements of a factual compilation. Because the facts themselves cannot be protected by copyright, "the copyright in a factual compilation is thin." *Id.* at 349, 111 S.Ct. at 1289.

The Court noted that the names, towns of residence, and telephone numbers listed by Rural were facts, not subject to copyright. Nor was the selection, coordination, and arrangement of Rural's white pages sufficiently original to merit copyright protection. "Rural's selection of listings could not be more obvious: it publishes the most basic information—name, town, and telephone number—about each person who applies to it for telephone service." *Id.* at 362, 111 S.Ct. at 1296. Rural's alphabetical listing of names and numbers showed no original elements of coordination or arrangement. The Court concluded that "Rural expended sufficient effort to make the white pages directory useful, but insufficient creativity to make it original." *Id.*

Prior to the Supreme Court's decision in *Feist,* the United States Courts of Appeals were split as to whether or not a person's hard work in collecting data in a compilation, by itself, was sufficient to justify a copyright in that collection of data. *See* 1 M.B. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 3.04[B] (1993). The view that hard work in a compilation justified copyright protection, also known as the "sweat of the brow doctrine," was explicitly rejected by the *Feist* Court. The Court recognized, in fact, that the very same facts and ideas assembled through hard work might lawfully be "restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas." *Feist,* 499 U.S. at 349, 111 S.Ct. at 1289.

■ Although the standard for creativity is "extremely low," the selector of a copyrighted compilation faces two hurdles. First, when a compilation author adds no expression to his compilation, and therefore lets the facts speak for themselves, he must rely on the originality of his selection and arrangement of facts to justify his copyright. *Feist,* 499 U.S. at 349, 111 S.Ct. at 1289–90. Second, even though the originality requirement is not stringent, the compiler's selection and arrangement of facts cannot be "so mechanical or routine as to require no creativity whatsoever." 499 U.S. at 362, 111 S.Ct. at 1296.

■ Citing *Rand McNally & Co. v. Fleet Management Systems, Inc.,* 591 F.Supp. 726, 737 (N.D.Ill.1983), Mid America urges that its properly registered copyright of its title commitment constitutes *prima facie* evidence of ownership of a valid copyright, and shifts to Kirk the burden to prove invalidity. In

*Feist*, however, defendant conceded that Rural's telephone directory considered as a whole, might be subject to a valid copyright because it contained some text and original material. Nevertheless, the Court concluded that the material copied by Feist was not copyrightable because the "selection, coordination and arrangement" required in compiling the telephone listings lacked originality. 499 U.S. at 362, 111 S.Ct. at 1290. The Court explicitly stated that because originality is a statutory and a constitutional requirement of copyright, the party alleging infringement bears the burden of showing "the existence of those facts of originality, of intellectual production, of thought, and conception" in its work. *Id.* at 346–47, 111 S.Ct. at 1288 (quoting *Burrow–Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884)). Thus Mid America bears the burden of proving both that it "selected, coordinated, or arranged [otherwise] uncopyrightable facts in an original way" and that Kirk copied the protectable element of its compilation.

█ Although a finding regarding the originality element of a copyright is a fact-driven inquiry, summary judgment may properly be granted where a jury could not, as a matter of law, find that the alleged copied material was original to the plaintiff. *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir.1992), quoting *Hoehling v. Universal Studios*, 618 F.2d 972, 980 (2d Cir.1980) (summary judgment appropriate where all alleged similarity relates to noncopyrightable elements). Therefore the threshold question before the court is which parts, if any, of Mid America's title commitment are copyrightable. The related question is whether Kirk infringed that particular element. Both of these issues may properly be addressed by this court on a motion for summary judgment.

### C. *Kirk's Motion for Summary Judgment: The Parties' Contentions*

█ In his Motion for Summary Judgment, Kirk raises the same arguments made in his earlier motion to dismiss. He notes that all of the facts presented in a title commitment are in the public domain. Relying on his own affidavit and that of Attorney Andrew C. Dystrup, Kirk urges that because the preparation of title commitments constitutes a mere rote task dictated by convention and compelled by legal and/or professional obligations, the process of culling information to be used in a title commitment lacks the requisite level of creativity for copyright protection under *Feist*. The fact that, as Mid America concedes, it is standard practice in the industry for examiners to use earlier commitments for the same property as "starters" in preparing fresh title, Kirk argues, supports the conclusion that this task involves no genuine creativity.

Mid America acknowledges that copyright protection is available only if its title commitment "reflects the exercise of judgment in determining what facts are to be included from the available data." *Kirk I*, 991 F.2d at 420, citing *Key Publications, Inc. v. Chinatown Today Publishing Enters., Inc.*, 945 F.2d 509, 513 (2d Cir.1991). Mid America's claim of originality and hence of copyrightability is based exclusively on its manner of selecting which, among the available universe of possible facts, to record in its title commitment. Mid America relies on the sworn declaration of its President, Thaddeus M. Bond, Sr., regarding decisions assertedly made by the title searcher in preparing the Schaaf commitment. Mid America argues that these decisions demonstrate that preparing the title commitment entailed sufficient selective judgment to satisfy the *Feist* originality test. (Mid America's Opposition to Kirk's Cross–Motion for Summary Judgment (hereinafter, "Mid America's Opposition"), at 12–15).

█ Kirk urges that the testimony of Mid America's President is insufficient to meet Mid America's burden of showing that the preparation of the Schaaf commitment required subjective decisions regarding which facts to record. Citing *Hollow Metal Warehouse v. U.S. Fidelity & Guaranty Co.*, 700 F.Supp. 410 (N.D.Ill.1988), Kirk asserts that Bond's testimony on these issues constitutes hearsay not properly considered under FED. R.CIV.P. 56(e). In *Hollow Metal Warehouse*, plaintiff offered testimony of its president to prove that a particular form, which was at

the heart of the parties contract dispute, constituted a "final change order." *Id.* at 412. The president had not participated in the negotiations himself, but rather based his testimony on a memorandum describing a meeting between the relevant parties. *Id.* Here, similarly, Mr. Bond reviewed the materials used to prepare the title commitment for the Schaaf property but did not prepare the title commitment himself. In fact, there is no evidence that Bond himself even interviewed the person(s) who did prepare the commitment. Mr. Bond therefore lacks personal knowledge regarding the selective judgment, if any, exercised in preparing the Schaaf commitment. Although Mr. Bond can testify to the general decision-making processes which, in his opinion and experience are required in preparing title commitments, his testimony regarding the examiner's specific decision-making process in this case is hearsay. Indeed, as Kirk points out, Mid America's reliance on Mr. Bond's opinion actually undermines Mid America's position. Mr. Bond's purported knowledge—based only upon his review of the Schaaf file folder and a title commitment—regarding the reasons that a title searcher included or rejected certain pieces of data suggests that such selections are indeed driven by convention rather than originality.

In any event, Kirk insists that an examiner's manner of selecting facts to include in a title commitment is not a creative process but rather is a mechanistic one, driven by rigorous professional standards. Kirk notes that a title examiner must "report all matters which could affect his client's interests and which are readily discoverable from those public records examined when a reasonably diligent title search is made." If an examiner diverges from these parameters, Kirk asserts, he or she may fail to reveal facts relevant to awarding title insurance and be subsequently held liable in tort for any resulting damages.[5] Emphasizing the distinction between an abstractor of title, on the one hand, and an insurer, on the other hand, Mid America urges that a title commitment is not a history of title but rather an opinion as to the condition of title and an offer to insure title subject to specified exceptions; accordingly, says Mid America, it need not contain all facts relevant to a piece of property. (Mid America's Brief in Opposition to Kirk's Cross–Motion for Summary Judgment (hereinafter, "Mid America's Opposition"), at 4–5.)

Kirk insists, however, that the professional standards for title insurers establish the parameters of selection and leave no room for genuine originality. Kirk invites comparison to the decision in *Victor Lalli Enters., Inc. v. Big Red Apple, Inc.,* 936 F.2d 671 (2d Cir. 1991), where plaintiff, a publisher of charts containing winning numbers in gambling operations, brought a copyright infringement suit against one of its competitors. The court noted that all publishers of such charts presented the same information; therefore, barring an error, the charts would inevitably be identical. The court concluded that plaintiff's charts were not entitled to copyright protection because they lacked the requisite minimum of originality under *Feist* to trigger copyright protection. Kirk argues that similarly, barring error, two examiners preparing title commitment for the same piece of property will refer to the same sources and ultimately record the same facts—namely, all facts affecting title.

Kirk notes, further, that the size of the universe from which a compilation's facts are drawn affects a compiler's claim to originality. A large universe of facts may be capable of sustaining multiple or original compila-

---

**5.** Indeed, some jurisdictions hold title insurers to the standard of liability generally associated with abstractors of title. *See, e.g., Moore v. Title Ins. Co.,* 148 Ariz. 408, 411–12, 714 P.2d 1303, 1305–06 (Ct.App.1985) (title insurer may be liable in tort for negligence if it holds itself out as a searcher of titles and provides the information for applicants to rely on); *McLaughlin v. Attorneys' Title Guaranty Fund, Inc.,* 61 Ill.App.3d 911, 18 Ill.Dec. 891, 895, 378 N.E.2d 355, 359 (3d Dist.1978) (person who seeks title insurance

expects to obtain a professional title search legal opinion as to the condition of title and a guarantee). Other courts refuse to impose tort liability on title insurers. *See, e.g., Greenberg v. Stewart Title Guaranty Co.,* 171 Wis.2d 485, ——, 492 N.W.2d 147, 150 (1992) (collecting cases); *Culp Construction Co. v. Buildmart Mall,* 795 P.2d 650 (Utah 1990) (collecting cases); *see generally* Annot., *Title Insurer's Negligent Failure to Discover and Disclose Defect as Basis for Liability in Tort,* 19 A.L.R.5th 786 (1994).

tions, whereas the choices available in selecting facts from a small universe may be so limited that no compiler can claim originality in its selection. Thus, for example, a compilation of baseball statistics was found capable of supporting claims of originality because the universe of pitching performance data from which an author could select was sufficiently large to sustain numerous original compilations. *Kregos v. Associated Press,* 937 F.2d 700 (2d Cir.1991). Kirk asserts that the size of the universe of facts from which title information is gathered is so small that an author cannot claim to have "selected" any data.

Mid America concedes that the standards examiners employ in selecting facts to include in title commitment are familiar and unoriginal, but argues that there is room within those parameters for original selection of facts. Mid America claims that the criterion examiners use for selecting facts is essentially a guideline—that is, it is the generic, rather than the creative component of a compilation. Mid America cites *Eckes v. Card Prices Update,* 736 F.2d 859 (2d Cir. 1984), where a compilation based upon the generic criteria of selecting "premium" baseball cards, and *Key Publications, Inc. v. Chinatown Today Publishing Enters., Inc.,* 945 F.2d 509 (2d Cir.1991), where a telephone directory listing of businesses of interest to the Chinese community, were both found to involve creative selection. Mid America concludes that its use of the generic criterion, "facts which affect marketable title" therefore, does not defeat its claim to originality. In *Eckes,* the use of the criteria "best" baseball cards to compile a card collector's book was held copyrightable because the selection of facts using this criterion depended upon a highly subjective evaluation, and it was the author's subjective evaluation and selection of the "best" cards which rendered the compilation original. *Eckes,* 736 F.2d at 863. Similarly, in *Key Publications,* a telephone directory was held copyrightable because the author had used her subjective judgment in selecting which businesses she felt would be of interest to, and would remain located for some time in the future within, the Chinese community. *Key Publications,* 945 F.2d at 513. Mid America asserts that

because an "examiner selects [only] those facts which in the exercise of the examiner's judgment need to be known by a lender or a purchaser of real estate," (Mid America's Opposition, at 7), the preparation of title commitments similarly involves subjective judgment. Here, however, in contrast to the plaintiffs in *Eckes* and *Key Publications,* Mid America has not presented specific evidence of the exercise of subjective selection or judgment. Moreover, Mid America has not resolved the contradiction between its concession that the criterion it employs—"facts which affect marketable title"—is generic and unoriginal, and its claim that an examiner's selection of "facts which need to be known by a lender" constitutes an original act.

Mid America's citation to *Mason v. Montgomery Data, Inc.,* 967 F.2d 135 (5th Cir. 1992) is equally unpersuasive. In that case, where plaintiff had prepared land ownership maps using title data from public records and from a title company, the court reasoned that each mapmaker's "selection of sources, interpretation of those sources, discretion in reconciling inconsistencies among the sources, and skill and judgment in depicting the information" was sufficiently original to trigger copyright protection. Kirk urges that the holding in *Mason* was expressly limited to the particular subject matter in controversy—maps. Indeed the *Mason* court's comments in *dicta* suggest that pictorial compilations may more easily satisfy the originality element of copyrightability than can non-pictorial compilations because they contain a purely creative, expressive element. *Mason,* 967 F.2d at 142.

■ In its analysis, the *Mason* court addressed an issue not squarely addressed by either party here: the doctrine of merger. Under that doctrine, plaintiff's claim of copyrightability is defeated if a particular idea is inseparable from its expression—that is, where an idea is incapable of being expressed in more than one manner, there can be no copyright in the expression. *Id.* at 140–41. The *Mason* court ultimately found that the map maker's "compilation" survived this test because the idea embodied in the plaintiff's map was capable of a "variety of expres-

sions." Mid America must similarly show that the sole expressive element in its material—its creative selection of facts to include in a given title commitment—is capable of being expressed in more than one manner.

Mid America's use of the testimony offered by its President, Mr. Thaddeus M. Bond Sr., on this issue is unconvincing. Mr. Bond offers a lengthy list of the kinds of facts through which an examiner must sift in selecting relevant documents to report. While size of the universe of facts is relevant to the possibility of originality, it is the author's subjective selection of facts from that universe and not the rote, albeit time-consuming effort of sorting through the data, that triggers copyright protection. In *Financial Information, Inc. v. Moody's Investors Service,* 808 F.2d 204 (2d Cir.1986), for example, the court concluded that, despite the plaintiff's embellished explanation of the time-consuming process required in publishing bond redemption data in simplified form, the process in fact was a simple, mechanical one, and incapable of triggering copyright protection. This conclusion was firmly endorsed by the Supreme Court's decision in *Feist,* where it concluded that the amount of labor that a compiler expends in preparing a work is irrelevant to granting copyright protection; rather, copyright may be awarded only where a work involves a spark of creativity. Thus Kirk's claim that Mid America's recitation of facts is an "attempt to conceal the simplicity of the process through lengthy descriptions of uncomplicated matters" appears to be well-founded criticism of Mid America's position. (Kirk's Cross–Motion for Summary Judgment, at 1.)

Mid America inadvertently supports Kirk's conclusion by drawing attention to the comparison of two title commitments which Kirk prepared for two different pieces of property—the one at bar, for the Schaafs, and one for another client, Ms. Kamenjarin. Mid America notes that, of these two title com-

mitments, only the Schaaf document includes information regarding drainage tiles—a piece of data which Mid America claims was copied from its own commitment. Mid America argues that normally (when there is no copying) title commitments contain different data, which is a reflection of an examiner's subjective assessment of what data is relevant to awarding title. Such differences between title commitments may also merely reflect differences between the histories of different pieces of property, however.

Using Mid America's terms, it is not clear from this evidence that such differences are properly explained by an examiner's exercise of judgment in selecting facts which "need to be known by a lender or purchaser of real estate" rather than by simply applying the generic criterion of selecting "facts which affect marketable title." Indeed, despite the one discrepancy between the two title commitments prepared by Kirk for the Schaafs and for Ms. Kamenjarin, the same basic ten categories of information [6] are included in both documents. The difficulty involved in isolating meaningful examples of original selection in Mid America's title commitment suggests that this material is susceptible to defeat under the doctrine of merger.

### D. Bond's Declaration Does Not Reflect Original Selective Judgment

Finally, even allowing Mid America the benefit of Bond's testimony regarding the specific selective judgment used in preparing the Schaaf commitment, any claim to originality based on this evidence is defeated under the same legal theories that apply to Mid America's more general claims. Bond's declaration sets forth the following decisions made by the title searcher: (1) the decision to use a legal description from the last title commitment policy drawn in 1976, rather than one based upon the 1883 Treaty of Tippecanoe which had been used for an earlier conveyance in 1954 (Bond Declaration, Ex.

---

**6.** The Mid America and Kirk title commitments for the Schaaf property and the Kirk commitment for the Kamenjarin property all include the following categories of information: (1) commitment number and effective date, (2) name of the proposed insured, (3) proposed amount of insurance, (4) the mortgagee, (5) estate in which the property is currently held, (6) legal description of the property and permanent index number, (7) current state of property taxes, (8) recording date of the existing mortgage, (9) recitation of any liens or rights of way, and (10) any limitations and/or exceptions to coverage.

L to Mid America's Reply Memorandum ¶ 6); (2) the decision to run a 20–year, rather than a standard 40–year search (*Id.* ¶ 7); (3) the decision not to include a reference to documents regarding past assignments of rent which have no bearing on the current title (*Id.* ¶ 9); (4) the decision to set out the property tax due dates and amounts payable rather than simply to state that the current taxes are unpaid (*Id.* ¶ 10); (5) the decision to record that part of the property falls within a public right of way (*Id.* ¶ 11); (6) the decision to except from the commitment any rights of way for "drainage ditches, and subsurface tiles, feeders and laterals" that may exist (*Id.* ¶ 12); and (7) the decision to certify that the street address and legal description are the same property by using a calculation of land area rather than set forth the lot dimensions (*Id.* ¶ 13). While making each of these selections took time, none of them entailed sufficient creativity to trigger copyright protection, for the following reasons.

■ The decision to use a modern legal description rather than one based on a 19th century treaty is not a creative one—it is as obvious as choosing, for example, to arrange customers' names in a telephone book in alphabetical order rather than listing those customer's names beginning with consonants first and those beginning with vowels, second. Moreover, the fact that Mid America used a private, rather than a public source to gain information available to the public at large does not bear on the issue of originality; the decision to use one of two possible sources for a piece of data cannot legitimately be characterized as "original." Thus Mid America cannot claim that its "manner" of selecting this fact is creative.

■ The examiner's decision to run a twenty-year, rather than a forty-year title search on the property is arguably a creative one. This decision is arguably analogous to a compiler's selection of distances to particular destinations in New York City to list in a cab driver's guide. *Nester's Map & Guide Corp. v. Hagstrom Map Co.,* 796 F.Supp. 729 (E.D.N.Y.1992). There, the court reasoned that while the actual calculations of distance was a noncopyrightable fact, the author's selection of which distances between destinations he would calculate, based on his knowledge and experience in the area, was copyrightable. *Id.* at 735. Although the decision to run a twenty-year, rather than a thirty or forty year search appears to involve less creativity than the compiler's decision in *Nester's Map,* this particular element might arguably involve sufficient judgment to be claimed "original." Because Mid America does not contest the fact that Ms. Peri, Kirk's secretary independently directed its title searchers, David, Varsek and Dystrup that a twenty-year search for the Schaaf property would be adequate, however, Kirk cannot be found to have infringed this element.

■ There is no genuine dispute that decisions three (not to reference irrelevant material), five (to record public rights of way), and six (to record rights of way concerning drainage) are ones driven by the profession. Even if title companies are not bound by any legal obligation, as Mid America asserts, to list those facts relevant to awarding title insurance, Kirk has offered unrebutted evidence that they are, as a practical professional matter, driven to do so. Moreover even if Mid America's manner of selecting these particular facts is in some way original, Kirk may copy the facts themselves at will. It does not appear, however, that there is any element of originality in the selection of these facts that can be isolated from the fact itself.

■ The remaining item, Mid America's decision to report the tax due amounts and dates rather than merely the status of whether they are current, suffers a similar flaw. This is arguably an "original expression" of fact. First, however, Mid America offers no claim or legal arguments supporting a claim to copyright in its particular form or expression of the facts—its claim was limited solely to its *manner* of collecting facts. Even if this argument were properly asserted, Mid America could only claim copyright over its particular expression and not the facts themselves. Kirk can freely copy these facts. As Mid America has admitted, Kirk's expression of these facts is not identical to Mid America's; thus, even if he used Mid America's title commitment for this in-

formation, he used only a non-copyrightable element.

Under *Feist,* only the manner of selecting facts, and not the facts themselves can be copyrightable. In this case, the selection of facts used in the compilation was guided by strong external forces. Further, Mid America's own report of the facts included virtually no original expression whatsoever. Mid America's concession that it is standard practice in the field to use the last title commitments prepared for a piece of property as a "starter" for preparing a new commitment, tends to suggest that copyright is not an appropriate means for protecting a title company's efforts in preparing title commitment. Examiners do not attempt to bring anything original to their final product; rather, they seek to record neither more nor less than those facts that are relevant to title. Because originality and not industry is the touchstone of copyright, Mid America's attempt to protect the labor it expends in preparing its title commitments in this manner cannot prevail.

### *CONCLUSION*

Mid America has not proven that Kirk copied any of the original copyrightable elements of its title commitment. Kirk's motion for summary judgment is granted, and Mid America's motion for summary judgment is denied.